Michael D. ST. CLAIR, Appellant

v.

COMMONWEALTH of Kentucky,
Appellee

2012–SC–000130–MR

Supreme Court of Kentucky.

RENDERED: FEBRUARY 19, 2015

See also, 2014 WL 4113014.

COUNSEL FOR APPELLANT: Susan Jackson Balliet, Robert Chung–Hua Yang, Assistant Public Advocates, Department of Public Advocacy, 200 Fair Oaks Lane, Suite 500, Frankfort, Kentucky 40601, Samuel N. Potter, Assistant Public Advocate, Department of Public Advocacy, 100 Fair Oaks Lane, Suite 302, Frankfort, Kentucky 40601

COUNSEL FOR APPELLEE: Jack Conway, Attorney General, William Robert Long, Jr., Assistant Attorney General, Office of Criminal Appeals, Office of the Attorney General, 1024 Capital Center Drive, Frankfort, Kentucky 40601

OPINION OF THE COURT BY
JUSTICE NOBLE

Michael D. St. Clair was convicted of capital kidnapping and other crimes, and was sentenced to death. In this matter-of-right appeal, conducted concurrently with this Court's mandatory review of the death sentence, he raises 35 claims of error. This Court ultimately concludes that evidence of another murder allegedly committed by St. Clair and evidence of that murder victim's background were improperly admitted. in this prosecution for kidnap-

ping. That evidence was prejudicial, and thus St. Clair's convictions are reversed.

## I. Background

St. Clair actually has two independent cases related to the same victim, one for capital murder and one for capital kidnapping, each tried in a different county. Convictions in both lines of cases have previously been reversed, and St. Clair has been retried and again convicted in both lines. This Court has affirmed his most recent murder conviction and sentence of death. *See St. Clair v. Commonwealth*, 451 S.W.3d 597 (Ky.2014) (*St. Clair Bullitt II*). This appeal arises from the parallel kidnapping case, which was re-tried in 2012.

The facts of the underlying offenses have been described in detail in the opinions addressing St. Clair's prior appeals. *See St. Clair v. Commonwealth*, 140 S.W.3d 510, 524–25 (Ky.2004) (*St. Clair Bullitt I*); *St. Clair v. Commonwealth*, 174 S.W.3d 474, 477 (Ky.2005) (*St. Clair Hardin*). Nevertheless, because this appeal stems from a retrial of the entire kidnapping case, a brief summary of those facts is necessary to frame the issues in the current appeal.

In 1991, St. Clair was in prison in Oklahoma awaiting sentencing for his conviction for two murders.[1] He and another inmate, Dennis Gene Reese, escaped from jail in a stolen truck. Soon after, they invaded the home of Vernon Stephens, and stole his truck, and a .357 Magnum Ruger Black Hawk revolver and ammunition that were used in later crimes. They then fled the state.

St. Clair claimed at trial that they soon separated in Texas, with Reese travelling to Colorado and New Mexico before meeting up again in Texas. St. Clair claimed he remained in Texas.

Reese, however, claimed they travelled together to Colorado. There, according to Reese, they kidnapped Timothy Keeling and stole his pick-up truck. They drove through New Mexico and, before entering Texas, one of them shot Keeling to death. (At trial, each claimed the other committed this murder.)

From Texas, St. Clair and Reese travelled through several southern states before ending up in Hardin County, Kentucky in October 1991.

In Hardin County, Frances Brady (also known as Frank Brady) was kidnapped and his pick-up truck was stolen. Shortly thereafter, he was killed in nearby Bullitt County.

St. Clair claimed that he was not involved in these crimes, testifying that Reese approached Brady alone and got into his truck and that the men drove away. St. Clair claimed he next saw Reese some time later when he returned alone with Brady's truck.

Reese testified that St. Clair participated in kidnapping Brady and that they transported Brady to Bullitt County together, where St. Clair murdered the man execution style. They then returned to Hardin County.

Regardless of what led them there, both men's stories converge with their setting fire to Keeling's truck in Hardin County shortly after Brady was killed. Witnesses to the fire called the Kentucky State Police and described Brady's truck, which had been seen near the fire. Kentucky State Trooper Herbert Bennett saw a truck matching the description and pulled it over

---

1. St. Clair had actually committed four murders, though he had yet to be tried for two of them. He was convicted of all four murders by the time of his 1998 trial in Kentucky, and was given consecutive life sentences for them.

in Hardin County. Reese and St. Clair were in the truck, which turned out to be the one stolen from Brady. A fight ensued, with St. Clair firing two shots in the trooper's direction. One of the shots hit the radiator of the police car. This allowed Reese and St. Clair to flee the scene and elude the trooper in a high-speed chase after his car died. St. Clair and Reese soon parted ways and were later arrested separately. St. Clair was caught in Oklahoma.

In December 1991, St. Clair was indicted in Hardin County for the kidnapping of Brady, the attempted murder of Trooper Bennett, two counts of receiving stolen property (both pick-up trucks), and second-degree arson (for burning Reeling's pick-up truck). In 1992, he was indicted in Bullitt County for the murder of Brady.

At that time, St. Clair was in Oklahoma waiting to be extradited to Kentucky. The Commonwealth decided that the indictments should be tried together and moved *ex parte* to have venue changed in the Hardin County case so that it could be joined with the Bullitt County case. The motion was granted, and the Hardin County offenses (kidnapping and others) were transferred to be tried .with the Bullitt County offenses (murder and others). After his extradition, St. Clair moved to have the indictments severed, arguing lack of notice of the change of venue motion, which was not served on St. Clair as required by RRS 452.220(1), and that the Commonwealth had not shown an inability to obtain a fair trial as required by RRS 452.210. That motion was granted, and the kidnapping indictment was returned to Hardin County.

The Bullitt County murder case went to trial first, in 1998, and St. Clair was convicted and sentenced to death. (Although that conviction was reversed, St. Clair has since .been re-convicted and again sentenced to death, and after further appeals, that judgment has now been affirmed.) At some point after that first Bullitt County murder trial, the Commonwealth gave notice of its intent to seek the death penalty for the kidnapping offense in Hardin County on the basis that Brady had not been released alive. While the Bullitt County murder conviction was on appeal, St. Clair sought a writ of prohibition barring death as a possible sentence in the Hardin County kidnapping case, arguing that such a sentence would violate double jeopardy. This Court disagreed. *See St. Clair v. Roark*, 10 S.W.3d 482, 486 (Ky. 1999) (*Roark*). In 2001, St. Clair was convicted in the Hardin County kidnapping case and sentenced to death. *See St. Clair Hardin*, 174 S.W.3d at 476. This Court reversed the conviction. *Id.* at 486.

On remand, the Hardin County kidnapping case finally went to trial again in 2009, but it was terminated before verdict by a finding of mistrial. During the Commonwealth's opening statement, indirect references were made to uncharged crimes (specifically, the murder of Timothy Keeling), which the trial court had previously ruled was inadmissible.[2] Based on this, St. Clair moved for ·a mistrial, which was granted.

Before the case could be tried yet again, St. Clair petitioned this Court for a writ barring his retrial, arguing that retrial would violate both the Interstate Agreement on Detainers and his federal and state constitutional rights to a speedy trial. *St. Clair v. Coleman*, No. 2007–SC–000901–OA, 2008 WL 2484715 (Ky. June 19, 2008) (unpublished opinion). We denied the petition. *Id.*

---

**2.** The ruling had actually been made by a judge other than the one trying the case in

2009, but the order had been upheld by the successor judge.

The case went to trial a third time in 2012. By that time, a new judge had been assigned the case. The evidence in the case was largely the same as it had been in the first case, though the court admitted evidence of St. Clair's other crimes and bad acts, specifically as to the killing of Timothy Keeling, that had previously been excluded.

The jury found St. Clair guilty of all counts, except for the arson charge, for which he was convicted of the lesser-included offense of criminal facilitation of second-degree arson. In the sentencing phase the jury found all three aggravating circumstances listed in the instructions, namely, that the kidnapping victim was not released alive, that St. Clair had a prior record of conviction for a capital offense, and that the kidnapping was committed during a robbery. The jury recommended that St. Clair be sentenced to death for the kidnapping. The jury also recommended sentences of twenty years in prison for attempted murder of the trooper, five years for each count of receiving stolen property, and five years for facilitation of arson, all to be served consecutively for a total of thirty-five years. The trial court sentenced St. Clair in accordance with the jury's recommendation.

St. Clair has now appealed this conviction and sentence as a matter of right to this Court. See Ky. Const. §§ 110(2)(b) & 115.

## II. Analysis

St. Clair has raised 35 claims to this Court. Because we are reversing his conviction and remanding for a new trial, we address only those issues necessary to the decision—either because they would give him a greater remedy than reversal and remand (such as his double-jeopardy claim), require the reversal (some of the series of evidentiary errors discussed below), or make it easier to discuss other issues even though there was no error (some of the other alleged evidentiary issues)—and those issues that are likely to recur on retrial and have not been sufficiently addressed elsewhere.

Before turning to St. Clair's claims, however, this Court observes that many of the difficulties with trying this case arose because the capital-kidnapping indictment was tried separately from the murder indictment in Hardin County. That need not have been the case.

Although St. Clair is responsible for this in part, because he moved to undo the change of venue that resulted in the cases being joined for a time, at least some of the blame falls on the Commonwealth. Although venue of the kidnapping offense was proper in Hardin County, it was also proper in Bullitt County. Offenses occurring partly in one county and partly in another may be tried in either county. See KRS 452.550. More specifically, "[w]here the offense consists of kidnapping, ... the prosecution may be in any county in which the person is seized or confined or through or into which he has been carried or brought." KRS 452.600. Frank Brady was originally seized in Hardin County and was then brought into Bullitt County. Thus, venue for kidnapping was proper in both counties.

And there is little question that the capital kidnapping and murder of Brady, if brought in the same county, could have been tried together. See RCr 6.18; cf. Wood v. Commonwealth, 178 S.W.3d 500, 514 (Ky.2005) (defendant tried for murder and kidnapping of same victim, and kidnapping of another victim). Criminal Rule 6.18 "provides for the liberal joinder of offenses," Peacher v. Commonwealth, 391 S.W.3d 821, 837 (Ky.2013), and a defendant is entitled to separate trials only if he

would be unduly prejudiced by the joinder, *see id.*; RCr 9.16.

But the Commonwealth nevertheless chose to try these cases separately once St. Clair was able to get the original venue change undone, rather than simply correcting the venue-change errors by giving proper notice. This duplication of trials has caused evidentiary issues to arise that would have been obviated in a single joint trial. Thus, this Court must wade through the evidentiary difficulties brought about by those separate trials.

■ Before addressing the merits of this case, it is useful to first lay out the scope and nature of this Court's review in a death-penalty case. As noted above, appeals of cases in which a defendant has been sentenced to death proceed to this Court as a matter of right. But this Court is also statutorily charged with reviewing death sentences. *See* KRS 532.075. That review requires this Court to "consider the punishment as well as any errors enumerated by way of appeal." KRS 532.075(2). And generally speaking, death-penalty cases are subject to more expansive and searching review than ordinary criminal cases. *See Meece v. Commonwealth,* 348 S.W.3d 627, 645 (Ky.2011) ("[T]he invocation of the death penalty requires a more expansive standard of review than is normally necessary in the criminal justice process."). Indeed, even unpreserved errors are reviewable. *See Sanders v. Commonwealth,* 801 S.W.2d 665, 668 (Ky.1990). This is because "[d]eath is unlike all other sanctions the Commonwealth is permitted to visit upon wrongdoers." *Rogers v. Commonwealth,* 992 S.W.2d 183, 187 (Ky. 1999); *Gregg v. Georgia,* 428 U.S. 153, 188,

96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) ("the penalty of death is different in kind from any other punishment imposed under our system of criminal justice").

It is with these principles in mind that we turn to the errors alleged in this case.

**A. Double jeopardy did not bar St. Clair's retrial.**

■ St. Clair's first, and most expansive claim, is that his retrial should have been barred by double jeopardy because his second trial resulted in a mistrial that, he claims, was the product of prosecutorial misconduct or provocation. This Court disagrees.

At St. Clair's second trial, at least three orders from the judge in the first trial (Janet Coleman) and other judges [3] who had been assigned the case were still in effect. Those orders allowed introduction of evidence of Timothy Keeling's kidnapping and carjacking but barred the admission of evidence that Keeling had been murdered (including circumstances of the death, such as the fact that two shots had been fired in the process and that Keeling had been shot).

Nevertheless, the prosecutor at the 2009 trial discussed Keeling's murder in his opening statement. The prosecutor began by describing the jail escape in Oklahoma. He then turned to the invasion of Vernon Stephens's home, at which point defense counsel sought a bench conference to inquire whether the prosecutor intended to mention St. Clair's other crimes, including the Keeling murder. The prosecutor stated: "I intend to comply with the previous rulings of Judge Coleman in this matter." Defense counsel argued that the Common-

---

**3.** Judge Hugh Roark presided over the case in the 1990s. Judge Janet Coleman presided over the 2001 trial. Special Judge Ann Shake replaced Judge Coleman in 2007, and Judge Stephen Ryan replaced Judge Shake in 2008. Judge Ryan presided over the aborted 2009 trial. Later, Judge Thomas Castlen was assigned the case, and he presided over the 2012 trial.

wealth should not be allowed to mention either Keeling's or Brady's murder because, after *Roark*, 10 S.W.3d at 486, murder was not an element of capital kidnapping and the prejudicial effect of evidence of murder would outweigh any probative value.[4] The trial court sustained the objection.

The prosecutor resumed his opening statement, and described how Reese and St. Clair had kidnapped Keeling and drove off in the man's truck; how in New Mexico they had stopped in the middle of nowhere, and St. Clair had gotten out of the truck and taken a handcuffed Keeling with him; and how Reese, who was sitting in the truck, "hears two gunshots and the defendant gets back in the truck ... only the defendant gets back in the truck."

At this point, the judge immediately called a bench conference and said, "Judge Coleman said that was not to be admitted." The prosecutor disagreed, stating that Judge Coleman had approved "from the bench" that "they stopped, he got out, there were gun shots," and argued that the only thing forbidden by Judge Coleman's earlier ruling was the word "murder." The judge stated that "the ruling was that the killing would not come into [evidence]." The judge turned to defense counsel, asking, "Do you have a motion ...?" Defense counsel moved for a mistrial.

The judge recessed court to look for the earlier orders before ruling on the motion. After the orders were found, the prosecutor argued that he had technically complied with Judge Coleman's order because

it only forbade saying "two shots were fired and Tim Keeling was shot," even though he had specifically stated in his opening that Reese heard two shots. Eventually, the prosecutor admitted that the various orders barred his mention of "two shots," but argued that this fact was admissible under the law of the case based on this Court's approval of such evidence in the parallel murder prosecution in Bullitt County.[5] The prosecutor asked for an admonition, but the judge stated that one would be insufficient.

Instead, the judge ordered a mistrial, stating, "You shouldn't have done it. I'm not saying it was misconduct; I'm saying you shouldn't have done it." The judge's written order says that based on the statements, "the jury could only infer that ... Mr. St. Clair had murdered Mr. Keeling in New Mexico." The written order confirming the mistrial explained:

> As stated at the time Of the mistrial, the Court finds that the Commonwealth had a good faith basis in believing that the evidence would be admitted based upon the prior rulings of other judges and the fact scenario laid out in the Supreme Court case, which reversed Mr. St. Clair's prior kidnapping conviction. However, the Court is of the opinion that granting a mistrial in this case was a manifest necessity.

In 2011, after Judge Thomas Castlen had been assigned the case, St. Clair moved to dismiss the indictment on the ground that his prosecution was barred by double jeopardy. He argued that his mo-

---

4. In *Roark*, this Court held that capital kidnapping is shown by proof of a kidnapping and the fact that the victim was not released alive (which can occur under circumstances that would not constitute murder), and that murder is not a necessary element of that offense. *See Roark*, 10 S.W.3d at 486. The Court noted, however, the proof of murder

could satisfy the requirement of proving the existence of an aggravating factor that would make the defendant eligible for the death penalty.

5. As St. Clair correctly points out, a decision in the Bullitt County case cannot have law-of-the-case effect in the Hardin County case.

tion for a mistrial was based on intentional prosecutorial misconduct.[6] The judge denied this motion, finding that "there was no prosecutorial misconduct nor did the prosecutor intentionally provoke the defense into moving for a mistrial."

■ Because the mistrial was the result of St. Clair's own motion, he faces a high burden to establish a double-jeopardy violation. The general rule is that "a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error." *United States v. Dinitz*, 424 U.S. 600, 607, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976) (quoting *United States v. Jorn*, 400 U.S. 470, 485, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971)). But "where a defendant's mistrial motion is *necessitated* by judicial or prosecutorial impropriety designed to avoid an acquittal, reprosecution might well be barred." *Jorn*, 400 U.S. at 492 n.12, 91 S.Ct. 547. While the standard for when such impropriety arises has wavered at times, the U.S. Supreme Court settled on a clear standard in 1982: "[T]he circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." *Oregon v. Kennedy*, 456 U.S. 667, 679, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982).

St. Clair fails to meet this high standard. The judge who presided over the 2009 trial found that the prosecutor had not engaged in misconduct and that he had a reasonable basis for believing the evidence he referenced would be admissible. And in 2011, Judge Castlen, invoking the language from *Kennedy*, specifically found

that the prosecutor did not intentionally provoke the defense into moving for a mistrial.

■ Whether the prosecutor intentionally provokes a mistrial is "a finding of fact." *Id.* at 675, 102 S.Ct. 2083. Such findings are reviewable on appeal only for clear error, meaning the "appella[te] court must determine 'whether or not those findings are supported by substantial evidence.'" *CertainTeed Corp. v. Dexter*, 330 S.W.3d 64, 72 (Ky.2010) (quoting *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky.2003)).

■ Though St. Clair argues that the record, specifically the orders laying out what would not be admissible at trial, belies the trial court's factual findings, this Court cannot say that they were clearly erroneous. Though the various rulings by three different judges were all clearly aimed in the same direction and allowed little ambiguity as to what was permitted, the inquiry is not limited to the content of the orders. Rather, we are concerned with "the intent of the prosecutor," *Kennedy*, 456 U.S. at 675, 102 S.Ct. 2083, which focuses on the subjective state of mind of the prosecutor. While that state of mind is to be inferred "from objective facts and circumstances," *id.* that analysis is not limited to a comparison of the orders and the prosecutor's opening statement. Though an extremely cynical take on what happened would lead to the conclusion that the prosecutor acted intentionally, that is not the only way to view the circumstances, which are equally compatible with the conclusion that he simply misremembered the precise limits of the orders. (This would, of course, be clear evidence of reckless or wanton conduct by the prosecutor, who had stated only minutes before

---

6. He also claimed that the mistrial was the result of a *de facto sua sponte* grant by Judge Ryan. The trial court found otherwise. This claim has not been resurrected on appeal.

that he would follow the previous orders, implying that he was aware of their content.[7]) The two trial judges presented with this question declined to take the cynical route and concluded there was no misconduct or intent. This Court will not overturn those conclusions.

Because St. Clair has not shown that his mistrial met the exception in *Kennedy*, there was no double-jeopardy bar on his subsequent retrial.

## B. Evidentiary errors.

St. Clair also alleges a series of evidentiary errors that this Court ultimately concludes requires reversal of his convictions. Specifically, he has alleged error in (1) the admission of evidence of Brady's murder; (2) the admission of evidence of the kidnapping and murder of Timothy Keeling; (3) the admission of evidence that he was a "max" security risk in Oklahoma, was wanted for murder, and was a danger to friends and family; (4) the admission of evidence that he was serving life without parole in Oklahoma; (5) the exclusion of evidence of a prior murder committed by Dennis Reese; and (6) the admission of testimony from Timothy Keeling's widow in the guilt phase.

Ordinarily, this Court would address only those issues necessary to the decision, which means less than all the issues raised when the judgment is reversed. But several of the issues here are likely to recur on retrial or are intertwined with the other issues, and thus we address issues other than those requiring reversal.

### 1. Admission of evidence of Frank Brady's murder during the guilt phase was not error.

First, St. Clair claims that the trial court erred in allowing the Commonwealth to introduce evidence that Frank Brady was murdered, rather than just that he was not released alive. He argues that this evidence was not relevant in his kidnapping prosecution and was unduly prejudicial. This Court disagrees.

■■■ In this case, St. Clair was charged with capital kidnapping under KRS 509.040. Ordinarily, kidnapping is either a Class A or Class B felony. KRS 509.040(2). It becomes a capital offense when the victim does not survive the kidnapping:

> Kidnapping is a capital offense when the victim is not released alive or when the victim is released alive but subsequently dies as a result of:
>
> (a) Serious physical injuries suffered during the kidnapping; or
>
> (b) Not being released in a safe place; or
>
> (c) Being released in any circumstances which are intended, known or should have been known to cause or lead to the victim's death.

KRS 509.040(2). The death does not have to be the result of murder, nor does it even have to be caused by the defendant. For example, the victim could die in a car accident while still in the defendant's captivity, which would elevate the kidnapping to a capital offense. *Roark*, 10 S.W.3d at 486. Based on this reading, we have expressly held that it is not the murder of the victim but "the *death* of the victim which enhances kidnapping to a capital offense." *Id.*[8]

7. St. Clair's argument that extreme wantonness is equal to intentional conduct is simply incorrect. While intentional homicides are treated the same as aggravatedly wanton homicides—both being murder—for purposes of determining a defendant's culpability, that does not mean that the mental states are the same.

8. *Roark* went on to say, however, that the fact that the defendant murdered the kidnapping victim could be used to satisfy the require-

Relying on this holding, St. Clair argues that evidence showing that Brady's death was caused by murder was inadmissible in the guilt phase of his trial because it was not relevant to show the elements of capital kidnapping. He claims that the Commonwealth could have proved the necessary fact—Frank Brady's death in the course of the kidnapping—by means of a death certificate,[9] and that the Commonwealth was limited only to showing the fact of the victim's death.

This argument is not well taken for several reasons. First, it is less than clear that a death certificate would have been sufficient proof. Though a death certificate would prove that Brady was dead, it would not directly prove that he died in the course of the kidnapping. It, in combination with other proof, could at best show that fact through a series of inferences, such as by showing the date and time of death, which combined with evidence of the time and duration of the kidnapping could justify an inference that the death occurred during the kidnapping.

But the certificate just as easily might fail to justify such an inference, not because it would show that the victim died after being returned safely but because it might fail to show the time of death or it might not be accurate. Though the death certificate might list a date of death or a time of death, that information does not appear to be required by law. *See* KRS 213.076.[10] And even if that information were listed on the death certificate, it would at best be an approximation given how Brady's death occurred (i.e., by violence outside the monitored context of a hospital). Other evidence, such as that the victim died at the defendant's hands, might prove necessary to show exactly when the death occurred in relation to the kidnapping.

ment of proving a statutory aggravating circumstance under KRS 532.025. That conclusion is questionable in light of this Court's reading of that statute in St. Clair's most recent appeal. *See St. Clair Bullitt II*, 451 S.W.3d at 643, 649–50, (holding that jury must find one of the eight listed statutory aggravators before imposing death). More importantly, for purposes of the kidnapping case, the mere fact of the victim's death in the course of the kidnapping is insufficient, by itself, to impose the death, penalty. While that finding is necessary for kidnapping to be a capital crime, the death penalty is not available in every successful prosecution for a capital offense. Instead, before imposing death, a jury must find the existence of a statutory aggravator, *id.*, in addition to finding the defendant guilty of a capital offense. Thus, the trial court in this case erred by instructing the jury that it could impose the death penalty if it found as an aggravating circumstance that Brady died in the course of the kidnapping. That sentencing error is addressed only in passing here because the underlying capital conviction is being reversed for a new trial, as explained below.

9. In his reply brief, St. Clair offers other means of proving the death of the victim, such as testimony from police officers or emergency workers responding to the scene. But those suggestions fail for the same reasons articulated below.

10. Though the title of KRS 213.076 indicates that it dictates the contents of a death certificate, very little is expressly required by the statute. For example, nothing in the statute even appears to require time of death to be recorded. The statute does refer to date and place of death, but only in the context of a provisional death certificate. *See* KRE 213.076(10). Subsection (*l*)(f) assumes that date of death will be recorded, as it requires the date of death to be "determined by approximation" in any instance where "the place of death is unknown but the dead body is found in the Commonwealth." Presumably, the exact contents of the death certificate are determined by the Cabinet for Health and Family Services. *See* KRS 213.041(2) ("Each certificate, report, and other documents required by this chapter shall be on a form or in a format prescribed by the cabinet with due consideration for national uniformity.").

■ Second, and more importantly, the Commonwealth is not limited to proving the cold fact of the time and date of death, nor is it required to force the jury to extrapolate from that information, along with any proof about when the kidnapping's illegal restraint occurred, whether the victim died in the course of the kidnapping. The Commonwealth is allowed to clothe the bare fact of the victim's death in context.

■ And, in fact, such context is expressly allowed by our Rules of Evidence. In essence, evidence that Brady was murdered is evidence of another uncharged crime in this case (the murder having been charged separately). Such proof is ordinarily barred by KRE 404(b) as evidence of other acts used to show character or propensity. But such proof may be admissible if offered for some other relevant purpose, KRE 404(b)(1), or "[i]f so inextricably intertwined with other evidence essential to the case that separation of the two ... could not be accomplished without serious adverse effect on the offering party," KRE 404(b)(2). Evidence is admissible under this latter provision

> when ... [it] furnishes part of the context of the crime or is necessary to a full presentation of the case, or is so intimately connected with and explanatory of the crime charged against the defendant and is so much a part of the setting of the case and its environment that its proof is appropriate in order to complete the story of the crime on trial by proving its immediate context or the res gestae.

*Webb v. Commonwealth*, 387 S.W.3d 319, 326 (Ky.2012) (quoting *Norton v. Commonwealth*, 890 S.W.2d 632, 638 (Ky.App. 1994)) (internal quotation marks omitted). And "where evidence is needed to provide a full presentation of the offense, or to

'complete the story of the crime,' there is no reason to fragment the event by suppressing parts of the *res gestae*." *Id.* (quoting *Norton*, 890 S.W.2d at 638). In essence, the jury "cannot be expected to make its decision in a void without knowledge of the time, place and circumstances of the acts which form the basis of the charge," *United States v. Masters*, 622 F.2d 83, 86 (4th Cir.1980) (quoting *United States v. Roberts*, 548 F.2d 665, 667 (6th Cir.1977)), and thus the prosecution is allowed to prove "the 'setting' of a case," *id.*

■ Proof related to the manner of Frank Brady's death in the course of the kidnapping, almost all of which came from Reese, was part of setting the scene and offering context for the kidnapping offense. Though the basic kidnapping offense is complete (in the sense that all of its elements are present) from the moment the victim's liberty is restrained by a person with an unlawful intent, *see* KRS 509.040(1), the offense nevertheless continues until resolved, hopefully with the victim's safe return but, unfortunately, sometimes with the victim's demise. This outcome determines the level of the offense, and thus proof of the circumstances of that outcome is not irrelevant.

■ Of course, this proof, like all proof, is still subject to the probativeness-prejudice balancing test of KRE 403. And under this test, even if some of the circumstances of Brady's killing were admissible, it does not necessarily follow that all of the proof was admissible. St. Clair argues that even if the evidence was relevant, its probative value is substantially outweighed by the danger of undue prejudice.

But given the evidence in this case, this Court cannot say that the danger of undue prejudice outweighed the probative value of the evidence concerning Brady's murder. If the core proof—that Brady was

killed during the kidnapping—was true, then it was fairly direct evidence establishing the time of Brady's death and thus proved that the death occurred during the course of the kidnapping. Therefore, its probative value was high. Of course, some of the evidentiary details, such as the specific manner of death (shooting) or the identity of the killer (St. Clair himself) had less probative value of the fact to be proved (death during the kidnapping), but they nevertheless had some probative value, consisting of additional details to flesh out the killing.

At the same time, there was little chance of undue prejudice from this proof. There is no question that the Commonwealth should have been permitted to introduce in the guilt phase proof of the kidnapping and the fact of the victim's death, as these were essential elements of the offense. As noted above, that proof came almost entirely in the form of testimony from Dennis Reese. The jury either believed his testimony or it didn't. That he was also allowed to testify about what he claimed were the circumstances of Brady's death was unlikely to change the jury's opinion about Reese's veracity.

When balanced together, this Court cannot say the danger of undue prejudice outweighed the probative value of this proof. Thus, this Court cannot say the trial court abused its discretion in admitting proof of the circumstances of Frank Brady's murder in the course of his kidnapping.

**2. Evidence of the robbery and abduction of Timothy Keeling was properly admitted but evidence of his murder was not.**

St. Clair also claims error in the Commonwealth's introduction of evidence of still other bad acts, specifically, those related to the abduction and murder of Timothy Keeling. The Commonwealth gave notice under KRE 404(c) that it intended to offer such evidence, and St. Clair objected. The trial court, despite having previously ruled such evidence inadmissible (when the case was presided over by another judge), allowed the evidence to be admitted in the third trial.

The complained-of proof consisted largely of Reese's testimony. He testified that St. Clair took the gun taken from Victor Stephens to Colorado, where the men abducted Timothy Keeling. He also testified that St. Clair pulled the gun on Keeling and handcuffed him when they abducted him and stole his truck. He also testified that they drove through the night to New Mexico and that, just before daybreak, St. Clair asked to stop for a bathroom break, telling Keeling that he "better use it, too." Reese claimed to have heard a gunshot, heard Keeling yell "Oh, God!", and then heard another gunshot. He said that St. Clair then got back in the truck alone with the handcuffs and that he admitted shooting Keeling twice, saying, "Killing people is like killing dogs; after you kill the first one, the next one is easy." He also claimed that St. Clair thought the murder was a joking matter and that it made St. Clair excited. He also testified that as they drove off, St. Clair went through Keeling's wallet and, on finding a picture of a little girl, tore up the picture and threw it out the window, and said, "There's a bitch that's going to grow up without a daddy."

The Commonwealth also introduced the testimony of a New Mexico State Trooper who investigated Keeling's murder. The trooper testified about the crime scene, stating that there was a lot of blood on Keeling's clothing and a blood trail in the grass. The trooper went on to testify about Keeling's wounds, which included a gunshot wound to the chest and one to the back of the head. He also testified about

the location of the body and how a person would get there from Denver and then into Texas.

The Commonwealth also introduced evidence of a Denver police officer's investigation into Keeling's stolen truck.[11]

▇▇▇▇ The Commonwealth now argues that St. Clair is barred from raising this issue because it is governed by the law of the case. Under the law-of-the-case doctrine, "an appellate court, on a subsequent appeal, is bound by a prior decision on a former appeal in the same court." *Inman v. Inman,* 648 S.W.2d 847, 849 (Ky.1982). The rule means that "issues decided in earlier appeals should not be revisited in subsequent ones." *Brown v. Commonwealth,* 313 S.W.3d 577, 610 (Ky. 2010).

The Commonwealth claims that this Court has previously decided the question whether evidence related to Keeling's murder could be admitted in his kidnapping trial, citing this Court's opinion in the appeal of his initial kidnapping conviction, *St. Clair v. Commonwealth,* 174 S.W.3d 474 (Ky.2005) (*St. Clair Hardin*). The Commonwealth notes that this issue was raised in that case and that the opinion, after reversing on a marital-privilege question, stated that "[m]ost [of the other] asserted claims were not error, frivolous, or are not likely to recur upon retrial," *id.* at 485, but that the Court would "address a few such claims of error that may recur upon retrial if the evidence is substantially similar," *id.* The issues then addressed did not include whether evidence of Keeling's murder was admissible. The Commonwealth argues that this omission, combined with the language quoted above about the other issues

raised, contains an implicit decision rejecting St. Clair's argument and that the law of the case would bar his raising it again.

▇▇▇▇ This argument, however, simply misunderstands the law-of-the-case doctrine and applies it far too broadly, especially in the context of a death-penalty appeal. Even when properly applied, the law of the case of an *implicit* decision "depends on a 'fiction,' namely, 'that issues which the Court ... did not address were decided against the party prevailing in that court.'" *Fischer v. Fischer,* 348 S.W.3d 582, 593 (Ky.2011) (quoting *Petzold v. Kessler Homes, Inc.,* 303 S.W.3d 467, 478 (Ky.2010)). But, importantly, St. Clair *won* his appeal in 2005. As this Court held generally in *Fischer,* issues raised by a winning party but not decided by the appellate court will not be treated as law of the case. Such law of the case by implication works, at best, against a party who lost the appeal and whose issue would have required a different result. *See id.* ("The theory underlying this approach is that if the appellate court had considered the issue to be meritorious, the court would have reached a different result: 'Our rule is that issues which, if sustained, call for dismissal, are taken as decided and rejected when the case has been reversed and remanded on the first appeal.' *Board of Trustees of University of Kentucky v. Hayse,* 782 S.W.2d 609, 614 (Ky.1989)." (other citations omitted)).

Moreover, this Court cannot even be sure that the issue was implicitly decided in the 2005 opinion. The opinion did not say that *all* other claims were not error or were frivolous; rather, it said that "most"

---

11. St. Clair complains also about testimony from Lisa Hill, Keeling's widow, about their life together. That evidence, however, was not evidence of other bad acts, as it was not testimony about the theft of the truck, the kidnapping, or the murder, and thus does not implicate KRE 404(b). That testimony, however, touches on other evidentiary rules, and is addressed below.

were. *St. Clair Hardin*, 174 S.W.3d at 485. Nor did it say that it was addressing *all* meritorious claims that were likely to recur at retrial; instead, it said it was addressing "a few such claims." *Id.* It may simply be that this Court believed the issue now being raised was unlikely to recur at retrial. In fact, in light of the orders issued by the trial court in that previous trial—all of which, as discussed above, were still in effect at the second trial—it appears that there were to be substantial limits on the evidence of Keeling's murder, though those limits were later lifted by the trial court. This Court cannot apply the law of the case to bar St. Clair from raising this issue.

■ Before turning to the merits of the claim, however, one more procedural issue must be addressed. It was suggested at oral argument that this Court's decision addressing this evidence in the appeals of the Bullitt County murder case could have issue-preclusive effect (i.e., collateral estoppel). Admittedly, in one of those appeals, this Court held "that testimony as to [St. Clair's] criminal conduct in Oklahoma, Colorado, and New Mexico prior to his murder of Brady as well as his post-murder shooting at and flight from Trooper Bennett was relevant and admissible under both KR[E] 404(b)(1) & (2)," *St. Clair Bullitt I*, 140 S.W.3d at 535–36, as evidence of how St. Clair acquired the murder weapon, evidence of St. Clair's motive in abducting Brady (i.e., his penchant for late-model small pick-up trucks), and evidence of a signature crime, *id.* at 536. In other words, this Court agreed with the trial court's evidentiary decision in that case allowing evidence of Keeling's murder in the prosecution of Brady's murder.

■ Issue preclusion, also known as collateral estoppel, "makes conclusive in subsequent proceedings only determinations of fact, and mixed fact and law, that

were essential to the decision." *Yates v. United States*, 354 U.S. 298, 336, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957). But evidentiary decisions are rarely essential to a decision. It is entirely possible that the trial court could have excluded the evidence in question in St. Clair's murder trial and he still could have been convicted. A decision as to admissibility of evidence of Keeling's murder is simply not the type of decision deserving of preclusive effect.

At best, then, this Court's decision in the murder appeal can have *stare decisis* or persuasive effects in other cases. But since evidentiary decisions depend on the circumstances of the case being tried, the opinion in St. Clair's previous murder trial is likely only to have persuasive effect. Indeed, the mere fact that the charge being prosecuted is different, though based on the same facts, would undermine any claim that *stare decisis* would bind this Court to conclude that the evidence was admissible in this case.

Turning then to the merits of St. Clair's claim, it will be helpful to divide the evidence into two groups: that related to Keeling's abduction and that related to his murder.

■ This Court has little concern over the evidence of Keeling's abduction. That testimony showed that St. Clair used the same gun and handcuffs that he later used to restrain Brady, that he picked Keeling because he had a late-model small pick-up truck (like the one later taken from Brady), and that he took Keeling from the scene rather than just taking his truck (again, like was later done to Brady). As it concerns KRE 404(b), this proof was used for a different purpose than simply to show St. Clair's propensity to engage in kidnapping (the charged offense in this case). The proof touched on St. Clair's *modus operandi* for kidnapping: using a

gun and handcuffs to steal a specific type of truck and abduct the truck's driver to prevent him from reporting the theft to police. As evidence of *modus operandi,* the proof tended to show the perpetrator's identity. The proof also touched directly on identity because the same gun and handcuffs were used in both kidnappings.

Thus, the evidence was relevant in a permissible way. It was used to show the identity of Frank Brady's kidnapper by showing the use of the same *modus operandi* in both crimes and by showing the use of the same implements in both crimes.

■ St. Clair complains that even if this proof fell under KRE 404(b)'s exceptions, it fails the KRE 403 balancing test. Under this test, even relevant evidence, such as that satisfying KRE 404(b), "may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403. This Court cannot say that the probative value of the evidence of Keeling's abduction was substantially outweighed by the danger of undue prejudice. That evidence went to St. Clair's identity as the abductor of Frank Brady and was narrowly cast.

The proof became too broad, however, when it came to Keeling's murder. As discussed above, evidence of Frank Brady's murder, even though that was not the charged offense, was admissible because it provided context for one of the elements of the charged offense (kidnapping with the victim not released alive). The evidence tending to show that St. Clair killed Brady was relevant because it had at least some "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evi-

dence." KRE 401. The fact of consequence, of course, was that Brady died during the kidnapping.

Although the evidence of Brady's killing was not all direct evidence of the element at issue, providing instead mere context, it was but one step removed from that element. That proof thus gave context to the evidence of the fact of Brady's death and supported an inference about the time of Brady's death. The proof thus had probative force, despite not being direct evidence of the time of death.

But Brady's murder, while inseparable from the other proof of the kidnapping offense, was not an essential element of the kidnapping offense; only Brady's death was. The manner of death—by murder—did not have to be proved; rather, the circumstances of this case and the nature of the proof allowed it to be admitted.

The evidence related to Timothy Keeling's murder was still farther removed from the fact of consequence (the time of Brady's death). The Commonwealth offered evidence of Keeling's murder to show St. Clair's murder *modus operandi,* and thus to indirectly show his identity as Frank Brady's killer. The idea was that if St. Clair killed Keeling in a certain way, then he must have killed Brady, who was also killed in a similar fashion. This, in turn, would tend to support the inference that Brady died in the course of the kidnapping.

■ First, several elements of this proof were irrelevant and thus were clearly inadmissible. St. Clair's statement that killing people was easy and Reese's testimony that St. Clair saw the killing as a joking matter and that it had excited him had nothing to do with his alleged *modus operandi.* This proof showed only that St. Clair was a cold-blooded, experienced kill-

er. That proof is improper character evidence and is forbidden by KRE 404. Similarly, St. Clair's action in tearing up the photo from Reeling's wallet and coldly commenting that the girl in the photo was "a bitch that's going to grow up without a daddy" was evidence only of despicable character, having nothing to do with St. Clair's alleged *modus operandi*. These aspects of Reese's testimony were simply irrelevant and thus were inadmissible.

■■ Other aspects of the proof of Keeling's murder, however, were technically relevant, in the sense of having *any* tendency to prove a fact of consequence, because they showed a "murder *modus operandi*" which would tend to show the identity of Brady's killer. But the chain of inferences needed to get from St. Clair's murder of Timothy Keeling to the fact that Frank Brady died in the course of a kidnapping that occurred much later and over a thousand miles away necessarily eroded the probative value of that evidence. The Commonwealth used Reese's testimony to prove that St. Clair killed Keeling by restraining him in handcuffs and shooting him execution style, which in turn was used to show St. Clair's murder *modus operandi*, which in turn was used to show that St. Clair killed Brady (who was killed in a similar fashion), which, in yet another turn, was used to further establish the time of Brady's death, i.e., during the kidnapping. At each step, the proof was farther and farther from the fact at issue and its probative value was reduced.

The probative force of the evidence of Keeling's murder was further diluted by the fact that there is no substantial independent confirmation of the events recounted by Reese. *See Bell v. Commonwealth*, 875 S.W.2d 882, 890 (Ky.1994) (noting the low probative value of other-acts evidence when it comes from the victim of the charged crime and is not corroborated). The independent evidence, such as that by the New Mexico State Trooper, did not tie St. Clair to Reeling's death; it only established that Keeling was found dead from two gunshot wounds.

Instead, Reese's own testimony provided the entire chain of events. To that extent, the Commonwealth sought to use his testimony as a sort of bootstrap bolstering: Reese's testimony that St. Clair killed Brady, which was used to show that Brady died during the kidnapping, was buttressed by Reese's own testimony establishing St. Clair as the killer of Keeling and the *modus operandi* used in that killing.

Overall, the probative value of this evidence was thus quite low.

At the same time, the danger of undue prejudice, confusion of the issues, and misleading the jury, all considerations under KRE 403, is very high with this evidence. As St. Clair notes in his brief, a substantial portion of the Commonwealth's prosecution of the capital kidnapping of Frank Brady focused on his execution-style murder of another person, Timothy Keeling. Evidence of an uncharged murder is inherently highly prejudicial, *cf. Bell*, 875 S.W.2d at 890("As for the prejudice side, there exists universal agreement that evidence of this sort is inherently and highly prejudicial to a defendant."), and though all evidence against a defendant has some degree of prejudice against a defendant (since it should, in some capacity, show guilt), this evidence was unduly prejudicial. Moreover, the Commonwealth injected what amounted to a whole other capital offense—a murder committed several states and more than 1,000 miles away— into this case, risking confusion of the issues in this case and risking misleading the jury into focusing on Keeling's murder instead of Brady's kidnapping.

Of course, the irrelevant evidence—St. Clair's statements and actions following Keeling's murder—had nothing but a prejudicial effect. And there is little doubt that the effect was high. By introducing this proof, the Commonwealth was able to paint St. Clair as an experienced, cold-blooded killer—a monster—before he even came to Kentucky.

And the trial judge in this case recognized that the proof came close to the line of impropriety under KRE 404 and 403. During examination about a diagram the New Mexico State Trooper drew of the scene of Keeling's death, the judge called the parties up to the bench to ask whether the Commonwealth was getting into too much detail about the Keeling murder. After a short bench conference, the judge ended up saying, "We have to be careful."

This Court concludes, however, that the evidence of Keeling's murder crossed the line in this prosecution for Brady's kidnapping, and was exacerbated by the introduction of irrelevant evidence. The probative value of this proof was substantially outweighed by the danger of undue prejudice, confusion of the issues, and misleading the jury. This calculus was likely why the three judges who presided over this case immediately before the third trial all concluded that this proof should be excluded. They properly erred on the side of caution when dealing with such inherently prejudicial evidence. This Court concludes that the trial court abused its discretion in admitting evidence of Timothy Keeling's murder by St. Clair at the third trial.

**3. Evidence of St. Clair's security risk in Oklahoma was properly admitted, and any potential error from evidence about his being wanted for murder and being a danger to friends was cured by admonitions.**

St. Clair also complains that the Commonwealth introduced evidence in the guilt phase that before his escape from prison in Oklahoma, he was a high security risk; that he was already wanted for murder when he was in Kentucky; and that he was a danger to friends who sheltered him. He argues that this evidence was all improper evidence of other bad acts under KRE 404(b).

▮ The evidence of St. Clair's security risk came from his own testimony in his 2001 trial, which was read to the jury in this case. In that testimony, he stated that before his 1991 escape, he was "in isolation," and that he did not get yard time because he "was considered a max" after such a conviction. This evidence was not objected to, but the trial court said that it was suggestive and told the Commonwealth to "watch it."

▮ The evidence that St. Clair was wanted for murder when he got to Kentucky was admitted through the testimony of Kentucky State Trooper Bennett. He testified that FBI Agent Phil Lewter told him that St. Clair was "wanted for murder" and "numerous other crimes," presumably referring to the crimes for which he had already been convicted. He also testified that Agent Lewter told him that the FBI had received "a call from Oklahoma or somebody once they got the hit on the NCIC system." St. Clair's counsel objected and moved for a mistrial. Defense counsel was offered but declined an admonition. The trial court nevertheless admonished the jury to disregard the comments.

The evidence that St. Clair was a danger to friends and family came from Oklahoma State Bureau of Investigation Agent Perry Unruh. He testified that "we" (meaning the police) had believed that even St. Clair's close friends who sheltered him after he left Kentucky and returned to Oklahoma "could be in danger." Counsel

objected and moved for a mistrial or an admonition. The trial court admonished the jury to disregard this statement.

This Court cannot say that the trial court erred in failing to *sua sponte* exclude the portions of St. Clair's prior testimony about his security risk in Oklahoma. To the extent that St. Clair complains that this proof violated KRE 404(b), as indirect evidence of his prior bad acts, it was nevertheless admissible to show the motive for his crimes upon his escape. As the Commonwealth argues, the fact that he was in maximum security gave him a motive to do anything to avoid going back to prison, including kidnapping and killing Brady and attempting to kill Trooper Bennett.

 The evidence that St. Clair was already wanted for murder when he arrived in Kentucky and that he was a danger to friends, while inadmissible, was the subject of two admonitions. St. Clair, of course, argues he was entitled to a mistrial instead. But "an admonition is usually sufficient to cure an erroneous admission of evidence, and there is a presumption that the jury will heed such an admonition." *Matthews v. Commonwealth*, 163 S.W.3d 11, 17 (Ky.2005) (citation footnotes omitted). And admonitions are preferred over mistrials, which should be granted sparingly and only "if [the] harmful event is of such magnitude that a litigant would be denied a fair and impartial trial and the prejudicial effect could be removed in no other way" or if there is "a manifest, urgent, or real necessity." *Id.* The trial court has broad discretion in this decision, and its "decision to deny a motion for a mistrial should not be disturbed absent an abuse of discretion." *Id.*

St. Clair argues that in at least one instance, he rejected the offer of an admonition, though it was still given. He implies that this somehow changes the effectiveness of the admonition or that it is the defendant's prerogative whether an admonition is sufficient. He is wrong on both counts. The simple fact is that the admonition was given and is presumed to have been followed.

 And the presumption that a jury will follow a curative admonition is overcome only when there is an overwhelming likelihood that the jury will be incapable of following the admonition and the impermissible testimony would be devastating to the appellant.[12] *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky. 2003).

This Court cannot say that the testimony that St. Clair now complains of was so devastating that it could not be overcome by an admonition. Thus, the trial court's choice of that remedy over granting a mistrial was not an abuse of discretion, and does not require reversal. It should be noted, however, that evidence which requires an admonition should not be offered on retrial.

**4. The trial court did not err in admitting St. Clair's prior testimony in which he claimed that he fired shots at Trooper Bennett because he was facing a sentence of life without parole.**

St. Clair also complains that the Commonwealth improperly impeached him with repeated references to his sentences of life without parole (LWOP) in Oklahoma. In this trial, St. Clair testified that he fired shots at Trooper Bennett (the would-be victim of the attempted murder) to disable

---

12. An admonition is also ineffective "if the question was asked without a factual basis and was 'inflammatory' or 'highly prejudicial.'" *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky.2003). There is no suggestion, however, that this standard applies here, nor is there any factual support for such a claim.

his car and get away. The prosecutor asked to be allowed to impeach St. Clair with his prior testimony that he fired those shots because he had two LWOP sentences. St. Clair objected. The trial court, however, allowed the impeachment, noting that the statements were inconsistent. Ultimately, eight references were made to the LWOP sentences.

St. Clair objects that his prior statements were not inconsistent with his testimony in this trial and thus they did not fall under KRE 801A and KRE 613. (Implicit in this argument is that the hearsay rules would otherwise bar his prior statements.) This argument is not well taken for two reasons.

■ First, the LWOP evidence was inconsistent with St. Clair's trial testimony. He claimed he only tried to shoot the trooper's car to escape from potential capture, which suggested a nefarious but nevertheless run-of-the-mill motive. That he had an LWOP sentence waiting for him undermines this claimed generic motive because it showed that the stakes were actually very high, which would allow a jury to infer that he was willing to do anything to escape capture, including murdering a police officer (and not just disabling his car).

■ Second, even if the statement was not just a prior inconsistent statement, it was an admission by a party. *See* KRE 801A(b). Such admissions are not excluded by the hearsay rules, *see id.* and are not limited by the procedural rules for prior-inconsistent statements, *see* KRE 613(b). Thus, to the extent that St. Clair is arguing that the hearsay rules barred the admission of his own statement, his argument must fail.

■ Anticipating this, he also argues that references to his LWOP sentences were irrelevant and overly prejudicial, and

thus violated KRE 401 and 403. But, as the Commonwealth argued to the trial court and discussed above, St. Clair's prior admission that he fired at Trooper Bennett showed his motive for trying to kill the trooper: to escape no matter the circumstances. That he was trying to escape an LWOP sentence, rather than merely escape possible capture by the trooper, was important to show that St. Clair was not merely trying to disable the trooper's car, but that he was willing to kill. This evidence went directly to the attempted-murder charge. It was, therefore, relevant.

■ Nor can this Court say that this proofs probative value was substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury. All relevant evidence offered against a defendant will have some prejudicial tendency; otherwise, it would not be offered. The question is whether it creates a danger of *undue* prejudice. This Court cannot say that evidence showing a defendant's motive for attempting to murder a police officer creates a danger of undue prejudice in a prosecution for that attempted murder. Nor can this Court say the evidence potentially confused the issues or misled the jury.

**5. The trial court did not err in excluding evidence of Reese's murder of Kathy Burns–Emerson.**

■ St. Clair's main defense at trial was to claim that an alleged alternative perpetrator ("aaltperp"), namely, Dennis Reese, committed the kidnapping and killing of Brady. To further this theory, he sought to introduce evidence of Reese's murder of Kathy Burns–Emerson. Burns–Emerson was an acquaintance of Reese, and they apparently had a sexual relationship. They grew crosswise with each other over a drug deal, however, and Reese killed her by choking her and beat-

ing her head with a board in a remote area. He admitted to police that he lost count of the number of times he hit her. He left her body there and took her pickup truck.

When the issue of Reese's crimes was raised before trial, the trial court ruled that St. Clair could introduce evidence of some of Reese's crimes, including that he had robbed a man in California and stolen his truck shortly before his arrest in Nevada (after the events in Kentucky), and *modus operandi* evidence that he would target homosexual men and people who would help homeless people (the theory being that this was how Timothy Keeling and Frank Brady were targeted, as St. Clair claimed they were approached by Reese under the guise of needing help or to initiate a sexual encounter). The court also ruled that St. Clair could introduce evidence that Reese had a capital murder charge pending in Oklahoma when finally captured after the Kentucky events, as that would tend to color his statements to police about St. Clair. But the court drew the line at evidence of the details of the capital-murder charge (the Burns–Emerson murder), concluding that it was not similar enough to show a *modus operandi* and thus that Reese had killed Brady.

■ St. Clair argues that this proof would have shown that Reese had a penchant for killing people in remote areas by causing head injuries and then stealing their trucks, which would support the theory that Reese killed Frank Brady. St. Clair thus proposes that the evidence was proper "reverse–404(b)" evidence, i.e., evidence of other bad acts of a witness, rather than those of the defendant, used substantively to show that the witness actually committed the crime. *See Beaty v. Commonwealth*, 125 S.W.3d 196, 215 n.4 (Ky. 2003) (" 'Reverse 404(b) evidence' is evidence of an 'aaltperp's' other crimes, wrongs, or acts offered by the defendant to prove that the 'aaltperp' committed the offense with which the defendant is charged."); *Blair v. Commonwealth*, 144 S.W.3d 801, 809–10 (Ky.2004).

■ Ordinarily, for evidence of other acts to be admissible as *modus operandi*, they must be very similar to the charged crime. *Billings v. Commonwealth*, 843 S.W.2d 890, 893 (Ky.1992). But "a lower standard of similarity should govern 'reverse 404(b)' evidence because prejudice to the defendant is not a factor." *Blair*, 144 S.W.3d at 810 (quoting *United States v. Stevens*, 935 F.2d 1380 (3rd Cir. 1991)). "If the evidence has relevance, then it should be excluded only upon application of KRE 403 principles, i.e., that its probative value is substantially outweighed by considerations of confusion of the issues, misleading the jury, or undue delay." *Id.*

The Commonwealth argues that despite the lower standard for admissibility, this evidence was nevertheless properly excluded because the events surrounding the murder of Burns–Emerson were too dissimilar from the crime in this case. This Court agrees.

■ Though the bar is set lower for admissibility of reverse–404(b) evidence, that evidence "is not automatically admissible." *Beaty*, 125 S.W.3d at 208. "[E]ven when offered by the defendant, evidence of a person's prior bad act may be admissible to establish identity only if 'the prior uncharged act is sufficiently similar to the charged act so as to indicate a reasonable probability that the acts were committed by the same person.' " *McPherson v. Commonwealth*, 360 S.W.3d 207, 213 (Ky. 2012) (quoting *Commonwealth v. Maddox*, 955 S.W.2d 718, 722 (Ky.1997)).

Here, the similarities are limited to the fact that the victims were killed by head

trauma, their bodies were left in remote places, and the victims' pick-up trucks were taken. These are superficial similarities absent more detail (e.g., that the pick-up trucks were all small, late-model ones).

And the differences were substantial. Burns–Emerson was beaten to death, whereas Brady was shot. Burns–Emerson was murdered over a drug deal gone bad, and the theft of her truck was incidental; Brady was murdered so that he could not identify his abductor and to further the theft of the truck, which had been the impetus for the abduction in the first place. Burns–Emerson was in a relationship with Reese; Brady was a stranger picked up at a gas station.

It is also important that the crime charged in this case (as opposed to St. Clair's Bullitt County case) was *kidnapping*. There was no suggestion that Reese kidnapped Burns–Emerson. While he may have driven her to the remote place where her body was found, there is no proof that she did not go willingly and was surprised when Reese turned on her.

In light of these differences, this Court cannot say the trial court erred in excluding evidence of Reese's prior crime as reverse–404(b) evidence. There was no abuse of discretion. Moreover, as explained below, at least some inquiry about the details of the Burns–Emerson murder was eventually allowed, which necessarily cured any error that could have occurred.

St. Clair suggests in the alternative that his counsel's cross-examination of Reese changed things and made the evidence of his prior crime admissible for impeachment purposes. He notes that Reese claimed to never have intentionally killed anyone. The trial court declined St. Clair's request at that time to impeach St. Clair with his guilty plea to the murder of Burns–Emerson. A week later, the trial court allowed some impeachment on this

point, with St. Clair's counsel asking Reese if he had hit Burns–Emerson so many times that he lost count. Reese denied making such a statement, and St. Clair's counsel sought to impeach him with affidavits from officers involved in the Burns–Emerson murder investigation indicating that Reese had indeed made such a statement. The trial court excluded this proof, holding that the affidavits were inadmissible extrinsic evidence. As the examination continued, Reese stated that he had only hit Burns–Emerson once and that the medical examiner had proved it.

St. Clair now complains that the trial court's exclusion of all the evidence of the Burns–Emerson murder prevented the jury from properly assessing Reese's credibility. Though this claim is brought in conjunction with the reverse–404(b) claim addressed above, it is substantively different. By trying to impeach Reese with his prior instance of bad conduct, St. Clair must have been operating under KRE 608. But that rule does not allow the admission of extrinsic evidence, and inquiry is limited to questions asked on cross-examination. *See* KRE 608(b). The trial court did not err in excluding the extrinsic evidence.

Moreover, it is not clear that the murder is even proper KRE 608 evidence as it does not "concern[ ] the witness' character for truthfulness or untruthfulness." KRE 608(b). That some evidence was erroneously admitted in St. Clair's favor, of course, is not reversible error.

**6. The testimony from Reeling's widow was error.**

The most troubling evidence in St. Clair's trial was the substantial testimony of Lisa Hill, who was married to Timothy Keeling at the time of his murder. Hill testified in the guilt phase, on direct examination, for approximately thirteen minutes. St. Clair argues that her testimony

was improper victim-impact evidence because Hill was not covered by the victim-impact statute and it was admitted during the guilt phase.

Hill testified that she married Keeling in 1989, just before she turned 20 and he turned 21. She testified that they lived in Denver, Colorado, where Timothy worked as a paramedic but also volunteered as a youth pastor in inner-city Denver. She discussed how she had worked with her husband for the church, working with at-risk youth. She testified that he bought his truck (the one eventually taken by Reese and St. Clair) at an auction and described the appearance and value of the truck. She testified that the last time she had seen him, he had left to get groceries, while she went to church. She explained that they frequently took in street kids to stay with them and kept groceries around for that. According to Hill, she never saw her husband again after he left. At that point, the prosecutor showed Hill a photograph, which she explained showed her and her husband at a friend's wedding. The prosecutor then asked Hill about Reeling's class ring. Around this time, Hill wiped tears from her eyes and then she described the ring and testified that she saw the ring again six days later when the police told her what happened to her husband.

The prosecutor then turned to whether Hill would have given permission to anyone else to use Reeling's truck, and she said no because it was her husband's truck. She testified that the truck had had a for-sale sign in its window because they had bought the truck at auction to resell it. The following exchange then took place:

Prosecutor: Was there some goal in mind to make some profit [from selling the truck]?

Hill: Everything we did was in efforts to work with the ministry down there, and we were about, we had just looked at a house in downtown Denver that we had planned to use for the street kids to be able to come in and get back on their feet and learn some skills and get off the streets. And so everything we did was for that purpose.

Prosecutor: Was there something ultimately beyond just the purpose of getting them off the streets?

Hill: Ultimately it was a relationship with God. That's what—Tim and I met in Bible College, and our whole purpose in life, everything that we talked about, our dreams were for that. [choking up] That kids who had been in difficult circumstances could really experience a different type of relationship with God than maybe what they had seen, and that they would see that through our lives.

The prosecutor then asked when Hill's second wedding anniversary with Keeling would have been, and she answered that it would have been four days after he was abducted.

The Commonwealth first suggests that St. Clair's claim about this proof was not preserved for review because Hill's testimony was not specifically objected to at trial. The Commonwealth claims that the generic pre-trial motion seeking to exclude all evidence of Keeling's murder was insufficient to preserve this claim. As this Court recently held in St. Clair's parallel murder case, the "motion to exclude all evidence of Keeling's death necessarily included ... testimony about his life and death. Even so, even if inadequately preserved, the relaxed standard set by *Sanders* would allow review." *St. Clair v. Com-*

*monwealth,* 451 S.W.3d at 624 (Ky.2014). The issue was therefore sufficiently preserved for review.

 Alternatively, the Commonwealth argues that Hill's testimony was proper because she was a victim of St. Clair's crime, as defined in KRS 421.500, and that she was thus allowed to offer victim background evidence.[13] The Commonwealth also argues that her testimony was "victim background" testimony rather than victim-impact testimony, which would be permissible only in the penalty phase. *See* KRS 532.055(2)(a)(7).

Ultimately, however, it makes no difference whether Hill's testimony was victim-impact testimony or merely victim-background testimony. Again, as this Court recently held, Hill simply was not a victim of the crimes for which St. Clair was on trial, nor was her husband Timothy Keeling. *See St. Clair v. Commonwealth,* 451 S.W.3d 597, 626 (Ky.2014). While both were the victims of *a* crime, neither of them was the victim of *the* crime being tried. Thus, just as "[t]estimony from a victim of a crime for which the defendant is not being tried is not relevant to sentencing for the tried crime," *id.* testimony about the background of a victim of a crime not being tried is not relevant in the guilt phase. Such proof is therefore inadmissible in any phase of the trial.

**7. The errors described above require reversal of St. Clair's convictions.**

 From the foregoing discussion, it is evident that many of St. Clair's evidentiary claims are meritless. At the same time, however, at least two categories of

evidence were admitted in error: evidence of Keeling's murder and testimony from Keeling's widow about his life. Taken individually, these errors, while no doubt somewhat prejudicial, may not rise to the level of reversible error. But this Court does not have to assess the errors individually. When these errors are viewed together, this Court cannot say they were harmless.

It is evident that the Commonwealth sought to make this trial as much about the abduction, robbery, and murder of Timothy Keeling—crimes over which the courts of this Commonwealth have no jurisdiction—as about the abduction, robbery, and death of Frank Brady in Kentucky. Although some of the evidence about the crimes against Keeling was admissible to show *modus operandi* and thus identity, just as much of that proof had no place in this trial, which was for the *kidnapping* of Frank Brady, not his murder.

Nevertheless, the Commonwealth tried this case as though it had been joined with the charge of murder of Frank Brady. While those offenses can technically be tried separately, and as this Court has held, separate death penalties may be imposed for them if the necessary factual showings and findings are made, the proof in such separate cases cannot be the same. When the capital-kidnapping charge is tried separately from the related murder charge, whether by necessity[14] or any other reason, the evidence will inevitably be less expansive than that in the murder trial because the murder is not an essential element of the capital kidnapping.

---

13. This argument omits a component, namely, that Keeling himself must have been a victim for his background to matter. It is obvious, however, that Keeling was a victim of his own kidnapping and murder, but not of Brady's.

14. For example, if Brady had been taken to another state and murdered there, his murder could not be tried in Kentucky, meaning any related kidnapping charge brought here would have to be tried separately.

As discussed above, evidence of Brady's murder is admissible in the guilt phase because it is inevitably intertwined with his death. But the indirect evidence tending to show St. Clair's identity as Brady's murderer, such as KRE 404(b) evidence about another murder supposedly committed by St. Clair, is not admissible in the kidnapping-only case. Such proof tends to take the focus off the matter at hand and begins making this case about the separate out-of-state murder charge. To also allow background proof about the victim of that other murder, even if intended to humanize that victim, further adds insult and elevates the Keeling murder to (or above) the level of the kidnapping case actually being tried.

Defense counsel argued to the trial court that even though St. Clair was charged only with kidnapping Brady and other crimes in Kentucky, there was no question he was also being forced to defend St. Clair on the crimes committed against Keeling in Colorado and New Mexico. Defense counsel was correct. Evidence of other crimes has its limits—in fact, such evidence is by default inadmissible, *see* KRE 404(b), and requires a high showing to meet an exception and thus become admissible.

And evidence about victims of other crimes beyond those being tried simply has no place in a criminal trial. Such proof is inherently prejudicial and threatens to confuse or mislead the jury.

The question, then, is whether the admission of this evidence was harmless. *See* RCr 9.24. "A non-constitutional evidentiary error may be deemed harmless, ... if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." *Winstead v. Commonwealth,* 283 S.W.3d 678, 688–89 (Ky.2009) (citing *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). This Court cannot say with fair assurance that the jury was not swayed by this impermissible proof. Even if this Court could not say for certain that the error had a substantial effect on the jury's verdict, it "is left in grave doubt" and thus "the conviction cannot stand." *Id.* (quoting *Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239).

This Court does not reverse a jury's verdict lightly, but St. Clair's death penalty for kidnapping "requires greater caution than is normally necessary in the criminal justice process," *Rogers v. Commonwealth,* 992 S.W.2d 183, 187 (Ky.1999), even if he stands convicted of Frank Brady's murder in another county. Ultimately, this case turned primarily on whether the jury believed St. Clair's or Reese's version of the events. Each man pointed the finger at the other as the kidnapper and killer of Frank Brady. Allowing proof of another murder, especially when that proof comes from the person the defendant claims actually committed the crimes, and proof of the background of the victim of that murder was necessarily prejudicial.

### III. Conclusion

St. Clair was not subjected to double jeopardy when he was re-tried after a previous trial resulted in a mistrial. Much of the evidence he complains of, such as evidence related to the murder of Frank Brady and *modus operandi* evidence related to St. Clair's supposed preferred method of kidnapping, was properly admitted or was cured by an admonition. Admission of the evidence of Timothy Keeling's murder by St. Clair, however, was error because it consisted of irrelevant matters and other matters whose limited probative value was substantially outweighed by the danger of undue prejudice, confusion of the issues, and misleading the jury. Admission of testimony from Timothy Keel-

ing's widow about his life was also error because it was irrelevant in this trial. Those evidentiary errors were not harmless. The remaining issues raised are not addressed in this opinion. St. Clair's convictions are reversed.

Minton, C.J.; Abramson, Cunningham, Keller, Noble and Venters, JJ., sitting. All concur.