# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: JUNE 15, 2023
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0098-MR

TREYVON M. DOWNS                                           APPELLANT

                ON APPEAL FROM MARION CIRCUIT COURT
V.              HONORABLE SAMUEL TODD SPALDING, JUDGE
                NOS. 20-CR-00051 & 20-CR-00052

COMMONWEALTH OF KENTUCKY                      APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Treyvon Malik Downs shot and killed Tevaughn Porter after meeting him to discuss the sale of Xanax bars. The main issue at the jury trial was whether Downs's killing of Porter was justified by the doctrine of self-defense. Downs was convicted of murder and tampering with physical evidence and sentenced to a total of twenty-five years of incarceration.[1] Downs raises trial errors relating to whether the Marion Circuit Court erred in failing to grant directed verdicts on the murder and tampering charges, erred in admitting improper character evidence in violation of Kentucky Rules of Evidence (KRE) 404(b), and

---

[1] Downs separately pled guilty to being a convicted felon in possession of a firearm and received a sentence of five years' concurrent with his other sentences. Although this conviction is nominally being appealed, Downs has not raised any issue on appeal related to this conviction and sentence.

cumulatively erred. We affirm as the motions for directed verdict were properly denied and any errors as to the admission of evidence were harmless.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Just after midnight on March 3, 2020, Porter texted Downs asking Downs if he wanted to buy any Xanax bars. At 3:26 a.m. they texted back and forth and at 3:30 a.m., Downs called Porter. Shortly thereafter, they met on Oak Street in Lebanon, Kentucky. While they were there, an altercation ensued and sometime after 3:44 a.m. Downs shot a .38 caliber revolver five times. He hit Porter once in the chest.

Gunshots woke several neighbors. Porter ran down Oak Street and banged on at least two doors and yelled "Help me."

Shannon Porter, who lived on Oak Street, heard someone beating on her door and calling her name. After she asked who it was, the person answered "It's Tevaughn Porter. I've been shot." Shannon knew Porter as she was related to him through her husband.

Shannon let Porter inside her home. Porter repeatedly told her that he had been shot by Trey Downs and was dying. Shannon called 911 and during the call, Porter was recorded in the background stating that Trey Downs shot him. Porter later died at the hospital as a result of a single gunshot wound to his chest which entered his left chest by the armpit and exited his right chest around his armpit.

Based on Porter's identification of Downs as the shooter and text messages on Porter's phone, officers attempted to locate Downs. They

2

ultimately were able to obtain his phone number, called him and arranged to take him to the police station for an interview.

Detective B.J. Burton with the Kentucky State Police interviewed Downs. During the lengthy interview, Downs repeatedly denied any involvement in the shooting, denied meeting Porter that evening and denied speaking to him that night. He also denied having any involvement with drugs or Xanax pills, and that he played with guns or used a gun that night.

Eventually, after being confronted with proof that he was involved, Downs admitted to shooting Porter but told detectives that he acted in self-defense because Porter was trying to kill him. Downs explained that Porter had a gun and demanded money from Downs, Downs refused, they started wrestling, Porter dropped the gun, Downs picked it up and Downs shot Porter as he tried to run. Downs clarified that Porter had tried to sell Downs some pills and when he refused Porter asked for money. Downs stated he tried to give Porter $3, Porter saw the money in Downs's hand and tried to grab it.

Downs made damaging admissions during the interview that were contrary to his claim that he acted in self-defense. Downs stated that after they had wrestled for the gun and Porter dropped it, "I get a hold of the gun, he's trying to run, and that's when I shoot him." When the detective asked "And, he's running away from you after you get a hold of the gun?" Downs answered, "Yeah." Downs also explained, "He seen when I picked it up. He was running, and I'm like . . . I'm gone."

Downs stated that after shooting Porter, he had someone drive him to Hamilton Heights where he got rid of the gun. He identified on a map where he left the gun and agreed to take them to the location. Once there, Downs told the police where to find the gun. The revolver was wrapped in a shirt and placed under a dirty diaper inside a grocery bag.

On June 1, 2020, Downs was indicted for murder, tampering with physical evidence, and felon in possession of a handgun. Prior to trial, the Commonwealth filed notice of its intent to introduce evidence pursuant to Kentucky Rules of Evidence (KRE) 404(b). Ultimately, the trial court permitted the Commonwealth to introduce photographs of Downs with guns, a silent video showing Downs handling firearms, and texts from within ten days of the killing which contained discussions relating to controlled substances, on the basis that this evidence was relevant to show motive and rebut Down's assertions that he did not use guns, had "nothing to do with" pills or drugs, and that he "wouldn't rob [Porter]."

Downs's account of what occurred on the night Porter was killed, as presented in his opening statement, included a denial he was buying drugs that night or had a gun with him. Downs stated Porter was selling drugs, Downs did not want drugs but offered to give Porter $3 to help him out. Downs stated Porter wanted more money, Porter used Porter's gun to try to rob Downs and Downs acted in self-defense.

Twenty-three witnesses testified for the Commonwealth about what Porter and Downs had been up to that night, hearing the gunshots, the resulting 911 calls, Shannon's observations, and the subsequent investigation. Admitted during trial was a video Downs posted on social media showing him holding a similar black revolver to the murder weapon, text messages between Downs and his sister Amber Downs about drugs, photos from Downs's phone showing him with weapons and drugs, and text messages between Porter and Downs showing them discussing Downs's possible purchase of an AR-type rifle.

Downs called four witnesses. He argued that Porter tried to rob him, Downs took the gun away from Porter, and he shot Porter in self-defense.

Downs's most important witness was Zach Robertson, who supported Downs's claim of self-defense. Robertson testified that at around 3 or 3:30 a.m. on March 3, 2020, he was in a car parked at an apartment complex off Oak Street waiting for his Tinder date to call him when he heard a commotion. He looked in that direction and in the low light saw two black men at the end of the road, one taller and one shorter (earlier in the trial it was established that Porter was much taller than Downs). Robertson testified he saw the taller man reach back to his waistband and grab a gun, and then saw a fistfight between them. As they went to the ground, the shorter man picked up the gun and stared firing almost instantly.

Robertson testified when he heard shooting he ducked. Then after a short pause of maybe thirty seconds, when he looked back up the two men were gone. Robertson testified he then drove away.

5

Robertson explained he did not know Downs. He did not come forward earlier because he did not want to get involved. He only came forward after speaking to an acquaintance of Downs who knew Downs was being charged with murder; at that point he felt obligated to speak up because someone was getting charged with murder for acting in self-defense.

## II. ANALYSIS

### A. The trial court did not err by denying Downs's motions for a directed verdict on the murder and tampering with evidence charges.

Downs argues he sufficiently preserved this issue in moving for a directed verdict at the end of the Commonwealth's case and at the end of all proof. In moving for a directed verdict, Downs only argued that for counts one and two of the indictment "the Commonwealth has failed to meet its burden regarding proof of the elements necessary in the indictments."

For motions for a directed verdict to be properly preserved, it is not enough that the defense makes such a general motion. The Kentucky Rules of Civil Procedure (CR) 50.01 requires that "[a] motion for a directed verdict shall state the specific grounds therefor." As noted in *Pate v. Commonwealth,* 134 S.W.3d 593, 597-98 (Ky. 2004), and the cases cited in support thereof in footnote 13, "Kentucky appellate courts have steadfastly held that failure to do so will foreclose appellate review of the trial court's denial of the directed verdict motion." Therefore, "[m]erely moving summarily for a directed verdict or making a general assertion of insufficient evidence is not enough" to preserve any error. *Commonwealth v. Jones,* 283 S.W.3d 665, 669 (Ky. 2009).

6

Accordingly, Downs's motions for directed verdict were insufficient to preserve this issue and we may only review for palpable error. However, even had these motions been properly preserved, Downs could not satisfy his burden.

In *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991), our Court specified how motions for directed verdict are to be evaluated by the trial court and then reviewed on appeal:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

> On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

### 1. Downs was not Entitled to a Directed Verdict on the Murder Charge.

Downs argues that the text messages between him and Porter could not support the theory that he planned to rob Porter and, instead, supported the opposite conclusion, that Porter planned to rob him. He also argues that Robertson's testimony established that Downs shot Porter in self-defense. Therefore, Downs argues that the Commonwealth failed to refute that he was privileged to act in self-defense. Downs additionally argues in his reply that

7

there was no evidence Porter was running away and the trajectory of the bullet through Porter indicates that at most he was turned to his side.

Downs ignores that in his own statement to the detectives, he stated that he shot Porter as Porter was running away. Also, as the Commonwealth points out, Downs running away after shooting Porter and then concealing the gun is also some evidence of a guilty conscience.

While there was evidence which supported Downs acting in self-defense there was also evidence which supported Downs murdering Porter. The jury was entitled to evaluate Robertson's credibility and ability to accurately interpret what he saw in low light. Ultimately, it was up to the jury to resolve what occurred and it would have been inappropriate for the trial court to resolve this issue through granting a directed verdict.

### 2. Downs was not Entitled to a Directed Verdict on the Tampering with Evidence Charge.

Downs argues that because he took the officers to find the gun, he could not properly be found guilty of "removing" the firearm as the jury was instructed as grounds for tampering. Downs argues it is reasonable to infer he was leaving the scene of the crime to get himself away rather than for the purpose of removing the firearm and there was no proof that he acted with intent to prevent the evidence from being available at trial when he took the gun with him. While he acknowledges that perhaps he "concealed" the gun, he states the jury was not instructed on him committing tampering through concealment.

8

The Commonwealth argues that there was sufficient evidence that Downs concealed the gun. The Commonwealth also argues that the fact that Downs took detectives to the location does not absolve him of the tampering charge anymore than remedial action would undo a theft.

In considering whether it was palpable error for the trial court not to grant Downs's motion for a directed verdict, we are concerned not with the specific jury instructions, but with what is required generally for a conviction for tampering.

> (1) A person is guilty of tampering with physical evidence when, believing that an official proceeding is pending or may be instituted, he:
>
>> (a) Destroys, mutilates, conceals, removes or alters physical evidence which he believes is about to be produced or used in the official proceeding with intent to impair its verity or availability in the official proceeding[.]

Kentucky Revised Statutes (KRS) 524.100.

The circumstances of Downs fleeing with the firearm, hiding it, and then denying any involvement with the shooting when questioned by the police provide a basis for inferring that Downs removed or concealed the firearm with intent to impair its availability in the official proceeding, however short-lived that intent may have been. Therefore, we are confident there was sufficient evidence to support a conviction for tampering through either concealing or removing the firearm.[2] It was properly left up to the jury to resolve this issue.

---

[2] These acts are not synonymous. "Construed in a manner so as not to render the word 'conceal' redundant, 'remove' must refer to the act of changing the location or

In his reply brief, Downs makes two additional arguments about why he should have been granted a directed verdict on the tampering charge. Downs argues that at most he "attempted" to tamper and that it is a defense pursuant to KRS 506.020 that he abandoned the effort to tamper. Whether Downs may have only attempted or abandoned his efforts to tamper could perhaps have gained traction if he had asked the trial court for instructions along those lines.

Downs also argues that if a suspect cannot "undo" tampering, there will be no incentive for suspects to cooperate with police. Such an argument is more appropriately addressed to the General Assembly as a reason why our tampering statute ought to be amended. It does not provide a justification for us to conclude that the trial court erred by failing to grant a directed verdict.

**B. Any Error in Admitting KRE 404(b) Evidence was Harmless.—Preserved**

Prior to trial, the Commonwealth filed a notice of its intent to introduce KRE 404(b) evidence in the form of photographs and videos of Downs possessing guns, videos of Downs rapping about murder and robbery, and text messages between Downs and others related to drug trafficking. The Commonwealth argued that this evidence should appropriately be introduced during its case in chief to demonstrate "motive, intent, preparation, plan, absence of mistake" and was also appropriate to admit to rebut Downs's statements to police during his interview that he did not handle guns, "had

---

position of a piece of an object in a way that moves it from the scene of a crime." *Commonwealth v. James*, 586 S.W.3d 717, 725 (Ky. 2019).

10

nothing to do with" pills or drugs, and that he "wouldn't rob [Porter]." Downs objected to such evidence being admitted.

The trial court agreed to allow some photographs of Downs with guns, a silent video showing him handling a gun, and texts from ten days before Porter was killed which related to drugs and tied into why he may have been meeting Porter as relevant to show motive and rebut Downs's previous denials of involvement with guns, drugs, and denial of robbing Porter. The trial court excluded the music videos. After this evidence was admitted at trial, the trial court admonished the jury not to consider this evidence as character evidence.

We review the trial court's decision to admit this evidence for abuse of discretion. *Matthews v. Commonwealth*, 163 S.W.3d 11, 19 (Ky. 2005).

KRE 404(b), which concerns character evidence regarding "other crimes, wrongs, or acts[,]" provides as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:
>
> (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or
>
> (2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

Of note, "the list provided in KRE 404(b)(1) is illustrative rather than exhaustive." *Kelly v. Commonwealth*, 655 S.W.3d 154, 165 (Ky. 2022).

We apply the *Bell v. Commonwealth*, 875 S.W.2d 882, 889-94 (Ky. 1994), test as summarized in *Leach v. Commonwealth*, 571 S.W.3d 550, 554 (Ky.

11

2019): "In order to determine if other bad acts evidence is admissible, the trial court should use a three-prong test: (1) Is the evidence relevant? (2) Does it have probative value? (3) Is its probative value substantially outweighed by its prejudicial effect?"

It is usually fairly easy to determine whether evidence is relevant and probative. Typically, the more challenging part of this evaluation is weighing "the prejudicial nature of the 'other bad acts' evidence versus its probative value." *Leach*, 571 S.W.3d at 554. Such evidence "is, of course, prejudicial to [the defendant] as all evidence of culpability is in a criminal proceeding" but is still properly admissible so long as it is not "*unduly* prejudicial because it is not unnecessary or unreasonable." *Luna v. Commonwealth*, 460 S.W.3d 851, 873 (Ky. 2015) (footnote omitted).

To justify its exclusion, "[t]he prejudice must go beyond that which is merely detrimental to a party's case and be of such character that it 'produces an emotional response that inflames the passions of the triers of fact or is used for an improper purpose.'" *Kelly*, 655 S.W.3d at 165 (quoting Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 2.25[3][d], at 135 (4th ed. 2003)).

### 1. Some Text Messages between Downs and his Sister about Drugs were Properly Admissible and the Remainder were Harmless.

The trial court admitted text messages between Downs and his sister Amber which concerned Xanax, marijuana and Percocet that took place on February 27, 2020, through March 1, 2020.

12

Downs argues that evidence that "[he] was involved in drug transactions with his sister was irrelevant to whether he killed Mr. Porter in self-defense[,]" "did not go to motive, nor was this inextricable intertwined to the case[,]" and would "make the jury hate him for something unrelated to the case" and caused the jury to wonder if he was on drugs the night of the shooting.

The Commonwealth counters that it was appropriate that it be allowed to introduce this evidence to counteract Downs's previous statements to establish his involvement with the drug trade and provide evidence of a motive for killing Porter (to get drugs or money). The Commonwealth notes that texts admitted in trial which Porter does not challenge, established that on the day of the murder Porter texted Downs that Porter had Xanax to sell and call logs showed that later a call was placed from Downs's phone to Porter's phone, they then met on Oak Street and Downs shot Porter.

The messages concerning Amber asking Downs about getting "Xans" and selling them to her was relevant, probative and more probative than prejudicial because it set the scene and provided the story or context of the crime as other messages made it clear that Downs was meeting Porter about obtaining Xanax. *See St. Clair v. Commonwealth*, 455 S.W.3d 869, 885 (Ky. 2015). Downs having a buyer for Xanax he obtained was part of the chain of events and was thus intertwined with the events that led to Porter's death and admissible pursuant to KRE 404(b)(2).

In contrast, the messages relating to Amber stating she wanted "this weed out of my house NOW" because it was smelly, Downs promising to get it

13

and stating the quantity, and Downs explaining that the "white residue" left on Amber's blender was "Prolly from that perc I crushed down" was of more marginal relevance.

While, "[u]nder Kentucky law, prior inconsistent statements may be introduced as an impeachment device *and* as substantive evidence[,]" *McAtee v. Commonwealth*, 413 S.W.3d 608, 618 (Ky. 2013), if they would otherwise be improper character evidence they must still satisfy the three part test regarding relevance, probativeness and whether that probativeness is substantially outweighed by the prejudicial effect of such evidence. These statements were relevant and probative regarding Downs's prior statements denying any involvement with drugs, but also somewhat prejudicial as showing his more extensive involvement with drugs. The prior statement regarding the Xanax had already established the falsity of Downs having nothing to do with drugs, and this was just piling on. However, considering the trial as a whole, this evidence was harmless.

### 2. The Photos and Videos of Downs Handling Weapons and Drugs were Excessive but Harmless.

Downs argues that the twenty-seven photographs admitted into evidence, which were taken from his phone, of him handling weapons and drugs were irrelevant to the shooting on March 3, 2020, many were repetitive, and this was highly prejudicial. He argues these photos "did nothing to help the jury determine whether he was defending himself when he shot Mr. Porter. Instead, they painted him as a liar who claimed he did not handle guns, nor messed with drugs."

14

Downs details the contents of each photo which included these general categories: (1) photos of Downs (by himself or with other people) holding handguns, long guns, AR-type rifles, and other weapons; (2) photos of guns or advertisements for guns; (3) photos of other men holding guns; and (4) photos of apparent marijuana and an apparent advertisement for Percocet.

Downs made denials in his interview about having anything to do with guns and drugs. He also argued in his opening statement that the gun was not his and he was not there to buy drugs. However, the evidence admitted at trial established that Porter offered in a text to sell Downs some Xanax and then Downs met Porter.

The evidence about the guns and drugs was relevant to help clarify whether Downs's account was accurate. His involvement in the drug trade made it more likely that he was meeting Porter for the purpose of buying drugs. His access to guns, made it more likely that the gun with which he shot Porter may have been Downs's gun.

However, the volume of photos was needlessly excessive and prejudicial where Downs admitted later to having shot Porter and text messages established Porter offered to sell Downs Xanax and Downs he had a reason to purchase Xanax. The fact that Downs handled many types of guns, showed an interest in guns and had photos related to drugs was cumulative of other evidence, which was more properly admitted because it had additional relevance. This evidence should have either been greatly limited or excluded, but any propensity towards criminal behavior this evidence provided was

15

unlikely to sway the jury's opinion as to whether Downs had acted in self-defense or not against a known drug dealer. Ultimately the admission of such evidence was harmless in light of the other proper evidence in the same vein.

### 3. The Text Discussion between Downs and Porter about Purchasing a Rifle was Harmless.

The trial court allowed into evidence a text exchange which took place on January 28, 2020, concerning Downs possibly wishing to purchase an AR-type weapon, with Porter acting as an intermediary. Downs argues this exchange should not have been allowed as it was remote in time and had nothing to do with the shooting.

We agree that this evidence was of limited relevance or probativeness, but it did provide a sense of the relationship between Downs and Porter and ultimately this short exchange was harmless.

## C. Cumulative Error does not Require Reversal.

Downs argues that the individual errors he has identified, when considered collectively warrant reversal for cumulative error.

> [T]he doctrine [of cumulative error] is necessary only to address "multiple errors, [which] although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." Still, the doctrine is a limited one. "We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial." If the errors have not "individually raised any real question of prejudice," then cumulative error is not implicated.

*Elery v. Commonwealth,* 368 S.W.3d 78, 100 (Ky. 2012) (quoting *Brown v. Commonwealth,* 313 S.W.3d 577, 631 (Ky. 2010), internal citations and paragraph break omitted).

16

Downs had the right to a fair trial, not a perfect one. *McDonald v. Commonwealth*, 554 S.W.2d 84, 86 (Ky. 1977). We are confident that the errors Downs identified regarding the admission of evidence relating to guns and drugs, while improper, did not render his trial fundamentally unfair. As Downs has said, the trial concerned whether he acted in self-defense or not. His credibility as to whether his later account of self-defense should be believed after he earlier denied any involvement with Porter's death or any involvement with a lifestyle involving guns and drugs, was central to this determination. Porter was not presented as a law abiding, wholly innocent party; there was evidence to suggest that both men were involved in a criminal lifestyle and, so, they were on a level playing field as presented as having similar propensities. Downs even argued in his closing that both of them were drug dealers. Thus, such evidence was ultimately harmless whether considered in isolation or cumulatively.

## III. CONCLUSION

We affirm the Downs's convictions and sentences by the Marion Circuit Court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Robert C. Yang
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Joseph A. Beckett
Assistant Attorney General