# IMPORTANT NOTICE

# "NOT TO BE PUBLISHED OPINION"

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED" PURSUANT TO RULE OF APPELLATE PROCEDURE (RAP) 40(D). THIS OPINION SHALL NOT BE CITED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE.

UNDER RAP 41, UNPUBLISHED OPINIONS OF KENTUCKY APPELLATE COURTS RENDERED AFTER JANUARY 1, 2003, THAT ARE FINAL UNDER RAP 40(G), MAY BE CITED BY A PARTY FOR CONSIDERATION BY A COURT IF THERE IS NO PUBLISHED OPINION THAT ADEQUATELY ADDRESSES THE POINT OF LAW BEING ARGUED BY A PARTY.

IF AN UNPUBLISHED OPINION IS CITED FOR CONSIDERATION BY A COURT THE OPINION SHALL BE SET OUT AS AN UNPUBLISHED OPINION IN THE DOCUMENT IN WHICH THE UNPUBLISHED OPINION IS CITED.

RENDERED: JUNE 25, 2026
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2025-SC-0026-MR

TANECA BARD                                   APPELLANT

V.

ON APPEAL FROM MCCRACKEN CIRCUIT COURT
HONORABLE JOSEPH ROARK, JUDGE
NO. 21-CR-00865

COMMONWEALTH OF KENTUCKY                   APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

After the first trial ended in a mistrial, a second McCracken County jury convicted Appellant, Taneca Bard ("Bard"), of two counts of first-degree criminal abuse, and one count each of first-degree sexual abuse, first-degree sodomy, first-degree rape, and resisting arrest. She was sentenced in accordance with the jury's recommendation to forty years of incarceration. Bard now appeals as a matter of right. *See* KY. CONST. § 110(2)(b). Having reviewed the record, the arguments of the parties, and the applicable law, we affirm the McCracken Circuit Court.

**BACKGROUND**

This criminal case arose from Bard's abusive conduct toward her daughters, which ultimately resulted in Bard being convicted of criminally abusing her oldest daughter, K.B.; raping, sodomizing, and criminally and

sexually abusing her daughter, B.D.; and resisting arrest. Between January 1, 2021, and August 27, 2021, when the incidents giving rise to the criminal charges occurred, K.B. was ten years old, B.D. was eight years old, and G.B., the youngest of the siblings, was four years old.

On August 6, 2021, Bard had brought in K.B. to be seen at the emergency department at Baptist Health hospital in Paducah for light sensitivity and pain caused by trauma to K.B.'s eye that resulted in a black eye. Bard gave differing stories to explain K.B.'s black eye. The children appeared disheveled and were hesitant to answer questions. A nurse from the hospital reported suspicions of child abuse to the Department of Community Based Services ("DCBS"), which led to the discovery of facts underlying the criminal charges in this case, detailed more below. Bard's first trial resulted in a mistrial, and the case was retried.

**The First Trial — Mistrial**

Bard's first trial resulted in a mistrial after the Commonwealth's expert witness, Dr. Melissa Currie ("Dr. Currie"), made several improper statements during her testimony. Dr. Currie, a child abuse pediatrician at Norton Children's Hospital, leads a team that evaluates suspected child maltreatment cases. She was acting in this capacity on August 31, 2021, when DCBS asked her to review the Bard family's case following K.B.'s visit to Baptist Health in Paducah earlier that month.

During Bard's first trial, the Commonwealth asked Dr. Currie what significant pieces of information aided in her review and evaluation of K.B. Dr.

2

Currie listed numerous factors, including that K.B. and B.D. had each independently disclosed during forensic interviews and to their foster parents that Bard threatened to shoot them with a gun she owned, told them she wished they were dead, and would point finger-gun gestures at them as if she intended to shoot and kill them. Dr. Currie also testified that K.B. described an incident in which their father hit them with a belt and Bard told him he was not hitting hard enough.

Defense counsel objected, and the trial court sustained the objection, noting that the statements were "so far outside the basis of anything that she is going to be able to relay in terms of the diagnoses of the children." The Commonwealth agreed, stating it "wanted to ask her to stop about five minutes ago." The Commonwealth agreed to discontinue that line of questioning and return to statements related to Bard striking the children with pots and pans and to the children's diagnoses. The trial court admonished the jury to disregard any statements made by Dr. Currie that did not relate to physical injury or bodily effects. Dr. Currie's testimony then continued.

The Commonwealth next asked Dr. Currie what information had been made known to her and was pertinent to her evaluation of B.D., excluding matters the children did not directly tell her, did not testify to, or that came from the father or other third parties aside from the doctors, foster parents, and DCBS. Dr. Currie asked whether she was permitted to disclose statements relevant to her diagnosis of psychological maltreatment. The trial court clarified that she could repeat statements made by the children or attributed to

Bard, but that she must limit her testimony to those sources. Dr. Currie then testified to several instances of abuse that B.D. disclosed and that supported her diagnoses. However, she also stated that B.D. told her foster mother that she "never wanted to go back and that she hates her mom." Defense counsel objected, and another bench conference followed. The Commonwealth expressed frustration regarding Dr. Currie's remote testimony and the difficulty of curtailing a witness over Zoom. The trial court acknowledged this limitation but advised the Commonwealth to ask more specific questions, and the Commonwealth agreed. The Commonwealth then instructed Dr. Currie not to testify about statements the children made concerning their feelings toward their mother.

The Commonwealth proceeded to ask, "As far as statements that B.D. said as far as physical abuse, did she also report about the feces, and drinking the urine, things of that nature?" Dr. Currie replied, "She did, and in addition, she reported that her mother had choked her, and she additionally talked about being made to move her great-grandmother's dead body to the car." Defense counsel objected, the Commonwealth apologized to the court, and Bard exclaimed, "I can't take no more of this. I'm sorry. I can't. Please take me back to the jail."

Defense counsel moved for a mistrial, arguing that the trial court had twice advised Dr. Currie that she could testify only to physical abuse and that an admonition could not cure the prejudicial nature of her statement about moving a dead body. Defense counsel emphasized that the statement had no

4

connection to physical abuse. The trial court noted that the cumulative effect of Dr. Currie's statements fell well outside the scope of her diagnoses. Defense counsel also argued that Bard's outburst requesting to return to jail prejudiced the jury. The trial court responded that it did not hear the outburst because of the commotion surrounding the objection, during which the court and the Commonwealth were instructing Dr. Currie to stop testifying. A technological delay prevented Dr. Currie from hearing those instructions immediately. Defense counsel acknowledged agreeing to allow Dr. Currie to testify virtually to avoid trial delay, though she conceded in hindsight that this may not have been the best decision. She further stated that Dr. Currie continued speaking after objections due to the technological lag, but conceded it was "no one's fault."

The trial court expressed concern that the children had already testified, yet the Commonwealth inadvertently introduced numerous additional statements through Dr. Currie that were not made by the children during their testimony. The court reasoned that, in light of the other testimony, the statement about moving a dead body was not overly grotesque, but it invited the jury to speculate about the circumstances surrounding the body. The court carefully noted that it did not believe the Commonwealth intentionally introduced the evidence, repeatedly referring to it as "inadvertent."

The trial court orally declared a mistrial "based on the statements and based to a lesser extent on the outburst." It later issued a written order reiterating the same findings and granting the motion for mistrial:

5

At approximately 10:30 am on the second day of trial, March 19, 2024, a statement was made by Dr. Melissa Currie related to the children moving a dead body, the Commonwealth's expert witness, to which defense counsel objected and moved for a mistrial. An admonition had been required previously during the testimony of Dr. Currie for other statements. The Court briefly recessed in order to allow arguments by counsel outside the presence of the jury as to the admissibility and/or the prejudicial nature of that statement. The Court, having heard the arguments of counsel and having considered the case law governing such instances, it [is] of the opinion that an admonition to the jury to exclude the statement as evidence would not be sufficient to overcome any prejudice possibly resulting to the defendant.

Therefore, IT IS HEREBY ORDERED as follows:

1. Defendant's motion for mistrial is GRANTED[.]

## The Second Trial

A retrial was held beginning September 4, 2024. In that trial, the children's recorded testimony was played before the jury.

### B.D.'s Testimony

B.D. testified about numerous instances of abuse by her mother, Bard. Bard hit B.D. with switches, pots, pans, belts, tree branches, and extension cords in the back, legs, arms, buttocks, and head. Bard kicked B.D. and picked her up and slung her on the ground. Bard burned B.D. with cigarettes on B.D.'s legs and arms, leaving permanent scars on B.D.'s body. B.D. described a time that she was lying on the couch and, as a punishment, Bard grabbed B.D. by the hair and stuck her head between Bard's legs and told B.D. to stick her tongue out to lick Bard's "privates."[1] B.D. stated that it tasted bad. B.D. stated that Bard made her do this a total of three to four times. When

---

[1] On an outline of the human body, B.D. circled the genital area to describe the area she identifies as "privates."

6

Bard was mad at B.D. she stuck her finger in B.D.'s "privates" and it did not feel good. This also occurred multiple times. When it did occur, B.D. stated that Bard acted "mad-happy," meaning that it happened after Bard yelled at B.D. or slammed B.D. to the ground but that Bard was smiling during the act and acted like Bard "wanted it to happen." Bard played with vibrating toys by sticking them in her own "privates" while B.D. and K.B. were in the room. When this occurred, Bard illuminated her "privates" with her phone that had a glitter case. Bard also used her phone to take pictures and videos of B.D.'s, K.B.'s, and G.B.'s "privates." When B.D. and K.B. tried to have even a little fun, Bard would punish them by forcing B.D. to drink Bard's urine, and it tasted gross. B.D. and K.B. were forced to sleep outside naked in the cold multiple times with snow on the ground. The family owned dogs, and the dogs relieved themselves inside the home because Bard would not take the dogs outside. When the dogs defecated inside the house, Bard would become angry at B.D. and K.B. and make them eat the dog feces, so B.D. and K.B. would try to clean up the feces and hide it from their mother. B.D. said she was forced to eat dog feces "ten or five times a day." B.D. described a time when K.B. ate the dog feces and vomited. Bard forced B.D. and K.B. to eat ants and cockroaches as a punishment. Bard would force B.D. and K.B. to physically fight each other, and if they didn't, Bard would hit them. Although Bard never sprayed B.D. with anything, Bard did spray B.D.'s father with mace. Once, B.D. was asleep on the couch and Bard tried to wake her up in the middle of the night. B.D. did not want to wake up, so Bard got a pot full of hot water and dumped it

on B.D. Bard then put a pot of cold water on the stove and put a rag underneath the pot and told B.D. when the fire alarm went off, to wake up her sisters. This resulted in a fire. The firefighters and police came to the house that night, and she tried to tell them that everything was going wrong in the house. B.D. testified that she would try to run away and get help but then Bard would drag her back into the house and hit her.

K.B.'s Testimony

K.B. likewise testified to numerous instances of abuse. K.B. described instances where Bard repeatedly hit K.B. and B.D. with brooms, extension cords, belts, tree branches, pots and pans. Bard once wrapped an extension cord around K.B.'s neck until K.B. passed out. The family had two large dogs that relieved themselves inside the home. If Bard found the feces, if it was fresh, she would make K.B. and B.D. clean the feces, but if it was old and moldy, as a punishment, Bard forced K.B. and B.D. to eat dog feces. Bard mostly made B.D. eat the dog feces because K.B. puked after she ate it. K.B. also puked after Bard forced K.B. to drink Bard's urine, but she was still forced to drink Bard's urine six or seven times. If K.B. did not do the dishes, Bard forced K.B. to eat the cockroaches from the dishes. K.B. recalled the incident where she ended up going to the hospital because of her black eye, which Bard inflicted by pushing K.B.'s eye "all the way back" with Bard's thumb, then hitting K.B. with her fist. This was not the first black eye Bard had inflicted on K.B. Bard burned K.B. and B.D. with cigarettes, a flat iron, and a hot comb. Once, K.B. "broke two of the bed bars because [she] was putting it together but

8

didn't know how," and Bard hit her in the head with the "bed bars" while K.B. screamed, but no one could hear her.  Once, Bard was mad at K.B. and B.D.'s dad and K.B. asked about when her dad would be home.  Bard told K.B. and B.D. that Bard bought their clothes, and all their dad bought them was their socks and underwear, so Bard made them strip down to their socks and underwear and stand outside for several minutes in the winter.  Another time, K.B. and B.D. were forced to sleep on the ground in a shed outside while there was snow on the ground.  K.B. had a three-year-old bite mark on her shoulder from when Bard bit her.  K.B. witnessed Bard put blue and purple toys in her "privates."[2]  Bard forced K.B. and B.D. to physically fight but told K.B. not to hit back or else Bard would spray her with mace.  K.B. witnessed Bard spray K.B.'s father with mace.  Bard would sit on K.B. and would not let her up. Bard would say hurtful words to K.B., such as calling her "fat" and telling K.B. she "never would be anything."  K.B. observed that the abuse first started after they returned from foster care after their brother got taken from Bard, and that Bard said that she didn't like people who came back from foster care because "they are messed up when they come back."

G.B.'s Testimony

G.B. testified about instances of abuse she witnessed against K.B. and B.D.  G.B. testified that she witnessed Bard hitting K.B. with pots and pans, giving K.B. a black eye two times, once with her hand and once with a "block

---

[2] On an outline of the human body, K.B. circled the genital area to describe the area she identifies as "privates."

9

piece," forcing K.B. and B.D. to eat dog feces, forcing K.B. and B.D. to sleep outside, and spraying K.B. and B.D. with mace. G.B. denied that Bard ever did any of these things to her.

Dr. Currie's Testimony

As a reminder, Dr. Currie is a child abuse pediatrician for Norton Children's Hospital. In her role as a child abuse pediatrician, Dr. Currie reviews the records of other sources to make a determination as to whether child abuse has occurred. The records she reviewed in this matter included medical records, law enforcement reports, reports from DCBS, forensic interviews, and photographs. She first became involved with the Bard family after DCBS referred the case to Norton Children's Hospital following an incident in which K.B. presented to Baptist Health Hospital in Paducah with a black eye.

Dr. Currie testified that, out of the information provided to her about K.B., the information most pertinent to her evaluation of K.B. was that there had been multiple physical assaults against K.B., at least one of which resulted in the documented injury of K.B.'s eye; K.B. was punched; Bard struck K.B. with switches, belts, pots, and pans; Bard forced the child to eat dog feces and bugs; Bard told K.B. that she was "worthless" "dumb" and "not wanted"; K.B. was not fed at times; K.B. was choked or strangled; and K.B. was forced to sleep outside as punishment. From this, Dr. Currie concluded that K.B. was the victim of physical abuse, psychological maltreatment, and child abuse by torture.

10

Dr. Currie reviewed photographs of B.D.'s back and concluded that the scarring was per se diagnostic of inflicted child physical abuse, meaning that such a pattern of scarring can result only from inflicted injury. Dr. Currie also noted marks on B.D. consistent with cigarette burns. Dr. Currie testified that, out of the information provided to her about B.D., the information most pertinent to her evaluation of B.D. was that there were reports that B.D. had been hit in the head with pots and pans; B.D. had been sprayed with pepper spray; Bard bit B.D.; B.D. was forced to eat bugs and dog feces; B.D. was choked; B.D. had boiling water poured on her; and that Bard sexually abused B.D. From the information provided to Dr. Currie, Dr. Currie concluded that B.D. was the victim of physical abuse, sexual abuse, psychological maltreatment, and child abuse by torture.

Dr. Currie testified that, after analyzing information provided to her concerning G.B., Dr. Currie concluded that G.B. was exposed to the torture of her siblings in an ongoing fashion in such a way that she met the criteria for psychological maltreatment.

Brandon Cupp's Testimony

Brandon Cupp, a patrol officer with Paducah Police Department, responded to a house fire at the Bard residence in December of 2020. It was apparent to Officer Cupp that the fire had begun on the stove. Officer Cupp had concerns about the state of the home. The house smelled overwhelmingly of dog feces, the bedrooms were uninhabitable, the mattresses in the bedrooms were soaked in feces, and it appeared as if the dogs had taken over the home.

11

Three children were sleeping on a two-cushion couch in the living room, which appeared to be the only habitable place in the home. There were burnt towels on the stovetop. The children were scared and upset. One girl was crying uncontrollably, and she told him that there were several things in the home that made her sad. Officer Cupp made a report to DCBS.

Casey Steenburgen's Testimony

Casey Steenburgen, a detective with Paducah Police Department, was the lead detective in this case. He became involved in this case when he responded with a DCBS employee, social service worker Michelle Davidson ("SSW Davidson"), to the report of suspected abuse following K.B.'s visit to the hospital for her black eye. When Detective Steenburgen arrived at the home, he saw and heard movement inside, but no one responded to his knocks at the door. As he returned to his vehicle, he observed who appeared to be Bard and three children leave the residence and quickly enter a vehicle and leave the scene. Later that afternoon, SSW Davidson arranged a meeting at the park with Bard and the children. Detective Steenburgen and another detective were also present at the meeting. Later the same evening, DCBS removed the children from Bard's care. The children underwent a forensic interview which revealed sufficient evidence for Bard's arrest. When Detective Steenburgen and two other officers attempted to effectuate the arrest, Bard behaved belligerently and wrapped her arms around the handrail of her staircase, making it difficult for the officers to place handcuffs on Bard.

12

Detective Steenburgen testified that Bard was brought to the police station for questioning. The Commonwealth asked whether Bard was "read her *Miranda*[3] rights," to which Detective Steenburgen answered in the affirmative. The Commonwealth asked if Bard talked to him, and he replied that she did not. The Commonwealth then asked, "when the interview — or attempted interview — was concluded, what did you do?" Detective Steenburgen described that he searched Bard's purse incident to arrest and located a "teal vibrating sex toy" and a phone in a glitter case.

Michelle Davidson's Testimony

SSW Davidson worked as a social services worker for DCBS. SSW Davidson first became acquainted with the Bard family in December of 2020, when DCBS received a report of suspected child abuse from law enforcement who responded to a fire at the home. A case was not opened at that time, although DCBS offered the family services to address preventing future fires and improving the condition of the home. In May of 2021, DCBS returned to the home following a domestic violence incident in which Bard pepper-sprayed the children's father. At that time, the condition of the home had deteriorated since SSW Davidson's visit in December. SSW Davidson testified that bottles of urine were lined across the back of the bathroom sink.

In August 2021, multiple reports were made to DCBS of suspected child abuse or neglect, particularly regarding K.B.'s black eye. However, at that

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

13

time, the family had been evicted and DCBS could not locate the family. Eventually, near the end of August, the family was located and SSW Davidson met with the family at the park. This meeting resulted in Bard becoming hostile and threatening to run away with the children and never let DCBS see them again. Bard then gathered the children and left. Following that incident, and in conjunction with the pending law enforcement investigation, DCBS ultimately obtained emergency custody of the children. DCBS arranged for the children to undergo a forensic interview. The case was then referred to Norton Children's Hospital.

Jury Conviction

The jury ultimately convicted Bard of first-degree rape, victim under twelve years of age (for digital penetration of B.D.); first-degree sodomy, victim under twelve years of age (for oral sodomy involving B.D.); first-degree criminal abuse, victim under twelve years of age (for abuse against B.D.); first-degree sexual abuse, victim under twelve years of age (for masturbating in B.D.'s presence); resisting arrest; and first-degree criminal abuse, victim under twelve years of age (for abuse against K.B.). The jury recommended a total sentence of forty years, and the trial court sentenced Bard in accordance with the jury's recommendation. Bard now appeals her conviction as a matter of right. *See* KY. CONST. § 110(2)(b).

14

**ANALYSIS**

On appeal to this Court, Bard alleges five points of error: (1) the retrial was a double jeopardy violation; (2) improper KRE[4] 404(b) evidence rendered Bard's retrial unfair; (3) the trial was tainted by prosecutorial misconduct; (4) a social worker's victim impact testimony about G.B. was improper and inflamed the jury against Bard; and (5) the cumulative effect of the errors rendered the trial fundamentally unfair. We address each of these arguments in turn.

**A. The retrial was not a double jeopardy violation.**

Bard's first claim of error is that the retrial after the mistrial was a violation of her double jeopardy rights.

Standard of Review

This issue is unpreserved; however, Bard requests palpable error review.

> A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

RCr[5] 10.26. "As this Court has repeatedly held, double jeopardy claims fall under the palpable error rule because this Court 'do[es] not want to let stand a conviction possibly tainted by double jeopardy.'" *Cardine v. Commonwealth*, 283 S.W.3d 641, 651 (Ky. 2009) (quoting *Terry v. Commonwealth*, 253 S.W.3d 466, 470 (Ky. 2007)). "This is basic palpable error review, where an unpreserved error requires reversal 'if a manifest injustice has resulted from

---

[4] Kentucky Rules of Evidence.

[5] Rules of Criminal Procedure.

15

the error,' which means there 'is [a] probability of a different result or [the] error [is] so fundamental as to threaten a defendant's entitlement to due process of law.'" *Id.* (quoting *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006)).

Application

The Fifth Amendment to the United States Constitution and Section 13 of the Kentucky Constitution bar successive prosecutions for the same offense. "Once jeopardy attaches, prosecution of a defendant before a jury other than the original jury or contemporaneously-impaneled alternates is barred unless 1) there is a 'manifest necessity' for a mistrial or 2) the defendant either requests or consents to a mistrial." *Cardine*, 283 S.W.3d at 647. "As a general rule, a mistrial granted on the defendant's motion removes any double jeopardy bar to a retrial." *Terry v. Commonwealth*, 153 S.W.3d 794, 803 (Ky. 2005). "[A] narrow exception to this rule [is] 'where "bad-faith conduct by judge or prosecutor," threatens the "[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict" the defendant.'" *Id.* (quoting *United States v. Dinitz*, 424 U.S. 600 (1976)).

> "[B]ad-faith conduct" means an "intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause," and "[o]nly where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion."

16

*Id.* (quoting *Oregon v. Kennedy*, 456 U.S. 667, 676 (1982)).  Our state case law

has followed this federal standard:

> The attachment of jeopardy merely begins the inquiry as to whether the Double Jeopardy Clause of the Fifth Amendment proscribes a retrial. ... When a trial is aborted at the volition of the defendant himself, the considerations are different from those that prevail when the interruption is precipitated by the prosecution or by the trial court sua sponte.... [I]f there is no bad faith and the choice has not been forced upon the defendant, he is not in a position to cry double jeopardy when the trial is relaunched.

*Commonwealth v. Lewis*, 548 S.W.2d 509, 510 (Ky. 1977*), abrogation on other*

*grounds recognized by Cardine*, 283 S.W.3d at 646.  "A party seeking to prevent

his retrial upon double jeopardy grounds must show that the conduct giving

rise to the order of mistrial was precipitated by bad faith, overreaching or some

other fundamentally unfair action of the prosecutor or the court."  *Tinsley v.*

*Jackson*, 771 S.W.2d 331, 332 (Ky. 1989).

> Because the mistrial was the result of [defendant's] own motion, he faces a high burden to establish a double-jeopardy violation. The general rule is that a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error.  But where a defendant's mistrial motion is *necessitated* by judicial or prosecutorial impropriety designed to avoid an acquittal, reprosecution might well be barred.

*St. Clair v. Commonwealth*, 455 S.W.3d 869, 882 (Ky. 2015) (internal citations

and quotation marks omitted).

Here, the mistrial was granted at Bard's own request.  However,

according to Bard, she was provoked into asking for a mistrial by bad faith

actions of the Commonwealth.  In support, Bard points out that the

Commonwealth's initial assertion during trial that the defense had Dr. Currie's

report for months and knew what Dr. Currie's testimony would consist of was false, as the trial court noted that Dr. Currie's report had been turned over to the defense less than a month before the first trial. Next, Bard asserts that the Commonwealth "asked questions about the children's statements that it could and should have asked the children." Because the Commonwealth had not asked the children, the Commonwealth "sought to introduce these statements via multiple layers of hearsay." Next, Bard cites the Commonwealth's argument that evidence of the children moving a dead relative is pertinent to the criminal charges but that the Commonwealth nevertheless conceded that "[w]e don't need that, we'll move on." Lastly, Bard argues that "the Commonwealth minimized Dr. Currie's statement and argued an admonishment was proper: 'An eight-year-old reporting that she helped move a dead body, which is extreme, doesn't...., isn't any more..., probably less extreme than a lot of the things they've heard." Taken together, Bard argues in her brief that this demonstrates bad faith on the Commonwealth's part:

> Despite the trial court's statement it believed the disclosures were unintentional and inadvertent, the Commonwealth's comments and arguments showed that it planned to get the inadmissible information to the jury. It is telling that the Commonwealth did not ask the children about these statements so that they could be properly cross-examined on them. Further, the Commonwealth never explained how moving a dead body was pertinent to the charges against Ms. Bard, but then admitted "We don't need that, we'll move on."

> Indeed, in the retrial, the Commonwealth did not ask Dr. Currie about the kids being forced to move the dead body. This is evidence of the prosecutor's bad faith. The only possible conclusion was that the Commonwealth intended to get away with conducting an unfair trial or to provoke a mistrial. This violated Ms. Bard's right to be free from a double jeopardy violation.

18

(internal citations to the record omitted).

Bard's arguments lack merit. Bard herself requested the mistrial, meaning that Bard must prove "judicial or prosecutorial impropriety designed to avoid an acquittal" to succeed on her claim. *See St. Clair*, 455 S.W.3d at 882. Bard cites no conduct by the Commonwealth rising to this level nor does she identify anything beyond the trial errors that resulted in the request for a mistrial. Adopted broadly, her view would mean that any mistrial precipitated by error would foreclose retrial, contrary to long-standing double jeopardy principles. That the Commonwealth avoided the earlier mistake in the subsequent trial indicates only standard, prudent trial preparation. Indeed, as the trial court itself recognized, the Commonwealth did not engage in intentional elicitation of the inappropriate testimony. The Commonwealth merely asked open-ended questions to which Dr. Currie responded in good faith, albeit with overly broad answers. As each of the Commonwealth, the trial court, and defense counsel recognized, allowing Dr. Currie to testify virtually compounded the difficulties and limited the Commonwealth's ability to promptly rein in the witness. In short, Bard falls far short of showing "intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause" or "governmental conduct . . . intended to 'goad' the defendant into moving for a mistrial." *See Terry*, 153 S.W.3d at 803. Bard's double jeopardy claim lacks merit.

19

**B. The trial court did not err by allowing KRE 404(b) evidence.**

The Commonwealth filed a pretrial Notice of [KRE] 404(b) Evidence in which it announced its intent to offer the following evidence "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident":

1. That the defendant forced B.D. and K.B. to sleep outside because they were acting like dogs.
2. There are, or [may be], several instances of criminal abuse spanning the time period listed in the indictment. The victims may testify about each instance of criminal abuse as it pertains to the defendant. Specifically, the victims being hit with switches, pots, pans, and belts. Further, the victims will testify about when their mother burnt them with cigarettes.
3. That the defendant took pictures of B.D.'s private parts during the time period listed in the indictment.
4. That officers responded to 841 North 25th Street to assist Paducah Fire Department and there were two pit bull dogs in the home. Further, that there was dog poop and pee observed all over the floor. Further, one child was observed crying uncontrollably, saying that there are a lot of things going on in my house that make me sad.
5. The above will be introduced through the testimony of B.D., K.B., G.B., and/or Brandon Cupp.

However, Bard alleges that the Commonwealth introduced improper 404(b) evidence without having disclosed its intent to do so. Specifically, Bard alleges that the Commonwealth elicited testimony from both K.B. and B.D. that Bard sprayed their father with mace; elicited testimony from SSW Davidson that she responded to a domestic incident where Bard pepper-sprayed the children's father while K.B., B.D., and G.B. were present; and repeated in its closing argument the testimony from K.B., B.D., and SSW Davidson that Bard allegedly sprayed the children's father with pepper spray or mace. In addition, Bard argues that the Commonwealth elicited testimony from Dr. Currie that

20

G.B. was "exposed to the torture of her siblings in an ongoing fashion in such a way that she met the criteria for psychological maltreatment," and she "was a victim of psychological maltreatment."

Standard of Review

Bard did not preserve this issue; however, she requests palpable error review under RCr 10.26, recited above.

> A palpable error is one . . . that "affects the substantial rights of a party" and will result in "manifest injustice" if not considered by the court, and "[w]hat it really boils down to is that if upon a consideration of the whole case this court does not believe there is a substantial possibility that the result would have been any different, the irregularity will be held nonprejudicial."

*Schoenbachler v. Commonwealth*, 95 S.W.3d 830, 836 (Ky. 2003). Manifest injustice requires a "probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin*, 207 S.W.3d at 4.

Application

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." KRE 404(b).

> It may, however, be admissible:
> (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or
> (2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

*Id.* Bard contends that the evidence that Bard used pepper spray or mace against the children's father, and that G.B. suffered psychological

21

maltreatment from witnessing abuse against her sisters, was irrelevant and highly prejudicial. Bard points out that she was not charged with any crime against G.B. or the children's father, so evidence of acts against them only served to paint Bard in an unflattering light and as a person more likely to mistreat K.B. and B.D. Bard argues that the evidence was repeated multiple times, through multiple witnesses, and in closing arguments, diluting any relevance while increasing its prejudicial value. *See Hall v. Commonwealth*, 468 S.W.3d 814, 826 (Ky. 2015) ("Not only will the probative worth of each additional gruesome photograph be incrementally discounted as the facts to be proven become ever more certain, but admission of additional photos will also correspondingly increase the danger of undue prejudice"). Taken together, Bard alleges that this evidence amounted to palpable error.

"[T]rial courts must apply [KRE 404(b)] cautiously, with an eye towards eliminating evidence which is relevant only as proof of an accused's propensity to commit a certain type of crime." *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994). "The admissibility of evidence under KRE 404(b) is evaluated under a three-part test: (1) relevance; (2) probativeness; and (3) prejudicial effect." *Gasaway v. Commonwealth*, 671 S.W.3d 298, 334 (Ky. 2023).

Generally, all relevant evidence is admissible. KRE 401. One exception to this rule is that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but the evidence is admissible if offered for a proper purpose. KRE 404(b). Here, evidence that Bard pepper-sprayed the father of her children was

22

relevant to add context to K.B.'s claim that, if she did not physically fight B.D., Bard threatened to pepper spray K.B. This piece of evidence shows that the threat of pepper spray was not merely illusory but was one Bard could deliver. This context indicates the type of control present when K.B. stated that her mother "made" her fight her sister. Further, "cruel punishment" is an element of criminal abuse. KRS 508.100(1)(c). A reasonable jury could conclude that the threat of pepper-spraying a child for not fighting their sister is "cruel punishment." Therefore, the evidence pertaining to the pepper spray was relevant for a purpose other than proving Bard's character. Further, the testimony about psychological maltreatment and victimization of G.B. was direct evidence that the abuse against K.B. and B.D. had occurred. Certainly, a reasonable jury could consider the fact that G.B., a third party, had witnessed abuse so pervasive and severe as to result in a psychological maltreatment diagnosis to G.B., as evidence tending to make the probability more likely that the abuse against K.B. and B.D. had actually occurred and was not fabricated as insinuated by Bard. Therefore, this is a situation in which the evidence of wrongdoing toward another person functions as direct evidence of the charged crimes against the victims and not merely as evidence intended to paint Bard in an unfavorable light. Ultimately, the evidence pertaining to both the pepper spray and maltreatment of G.B. is highly relevant to the charged offenses.

"After determining relevancy, the trial court must determine if the evidence of the uncharged crime is sufficiently probative of its commission by

23

the accused to warrant its introduction into evidence. It is sufficiently probative if the trial judge believes 'the jury could reasonably infer that the prior bad acts occurred and that [the defendant] committed such acts.'" *Leach*, 571 S.W.3d 550, 554 (Ky. 2019) (quoting *Parker v. Commonwealth*, 952 S.W.2d 209, 214 (Ky. 1997)). Here, evidence was offered to establish that Bard pepper-sprayed the father of her children and that G.B. was exposed to the torture of her siblings in an ongoing fashion in such a way that she met the criteria for psychological maltreatment. The evidence offered here was probative of the commission of both of these acts. K.B. and B.D. testified that they directly witnessed Bard pepper-spraying their father. SSW Davidson testified that she responded to a domestic altercation involving Bard pepper-spraying the children's father. The cumulative effect of the testimony is highly probative as proof that Bard did, in fact, pepper spray the children's father. In addition, testimony from a Board-certified child abuse pediatrician that she was so certain that G.B. was exposed to such severe and pervasive abuse that it was psychological maltreatment is highly probative of the fact that G.B. was, indeed, exposed to the abuse against her sisters. Ultimately, the evidence offered was probative to show that the alleged wrong acts had occurred.

The last question to be answered is whether the evidence's probative value is "substantially outweighed by its prejudicial effect." *Leach*, 571 S.W.3d at 554. "Prejudice means that evidence produces an emotional response that inflames the passions of the triers of fact or is used for an improper purpose," *id.*, such as to "provoke[] [the jury's] instinct to punish or otherwise . . . cause a

24

jury to base its decision on something other than the established propositions of the case," *Webb v. Commonwealth*, 387 S.W.3d 319, 328 (Ky. 2012). Here, the evidence, when viewed in light of the entire case, was not unduly prejudicial. Given the varied nature and number of the allegations of abuse against K.B. and B.D., the jury hearing that Bard pepper-sprayed the children's father in their presence was likely the least prejudicial information they heard. In the same vein, the jury's learning that G.B. witnessing the abuse caused her psychological harm was a fact the jury might have speculated on their own given that the other evidence showed that G.B. was present in the home and that K.B. and B.D. experienced near-constant abuse. Taken in context, the prejudicial value of the evidence was low.

In balancing the low prejudicial effect of the evidence against the high relevant and probative value, we cannot say that the trial court erred in not excluding the evidence, particularly when the court was not presented with an objection from defense counsel. Even more so, we cannot say that the trial court committed palpable error.

### C. The trial was not tainted by prosecutorial misconduct.

Bard alleges that the Commonwealth took several actions amounting to prosecutorial misconduct. First, the Commonwealth asked the lead detective in the case, Casey Steenburgen, whether law enforcement read Bard "her *Miranda* warnings" to which Detective Steenburgen answered in the affirmative. The Commonwealth asked if Bard talked to him, and he replied that she did not. Another testifying detective, Detective Slack, was asked about Bard's

25

demeanor when police arrived to interview her. Detective Slack indicated that when detectives went to talk with Bard on the evening she was arrested, Bard was "non-compliant, did not want to talk to detectives, at one point tried to close the door on [them], and then remained resistant and aggressive throughout [their] contact." The Commonwealth repeated Detective Slack's testimony in its closing argument when it stated that Bard "didn't want to talk." Bard asserts that the Commonwealth soliciting and commenting on evidence as to Bard's exercise of her Fifth Amendment[6] right to remain silent was prosecutorial misconduct.

Next, Bard cites the Commonwealth's comments that G.B. was a victim as a basis for prosecutorial misconduct. During the Commonwealth's opening statement, the Commonwealth stated that G.B. "was never physically abused; however, she was abused in the sense that she had to witness all of these acts taking place." In the Commonwealth's case-in-chief, the Commonwealth asked SSW Davidson, "Do you know the victims in this case, [K.B.], [B.D.], and [G.B.]?" SSW Davidson responded in the affirmative. The Commonwealth asked how she knew them, and SSW Davidson responded, "[t]hey were on my caseload at one point." Bard argues that the characterization of G.B. as a victim in this case was improper. In addition, during its case-in-chief, the Commonwealth asked Dr. Currie about the status of [G.B.], and Dr. Currie testified that G.B. "was exposed to the torture of her siblings in an ongoing

_____

[6] of the United States Constitution

26

fashion in such a way that she met criteria for psychological maltreatment," and she "was a victim of psychological maltreatment." Bard alleges that the Commonwealth made several inappropriate statements in its closing argument. The Commonwealth first remarked that "[G.B.] never got abused. I'm not even going to argue [G.B.] got abused. Even though I might want to, I'm not going to." The Commonwealth reiterated that "[G.B.] was never abused." Later in its closing, the Commonwealth stated that G.B. "told us the defendant never hurt her, but she witnessed her hurt [B.D.] and [K.B.]." And finally, in its closing argument, the Commonwealth stated, "For [G.B.], [Dr. Currie] only diagnosed her with psychological maltreatment. And [Dr. Currie] told us that was because [G.B.] had to observe her sisters being abused." Lastly, during sentencing, the Commonwealth asked DCBS social service clinician Paige Young ("SSC Young") about the children's behavior in foster care. The Commonwealth asked, "do you feel like a lot of these behaviors from [K.B.], [G.B.], and [B.D.] are because of the trauma they went through?" SSC Young responded, "[t]here's not a doubt in my mind that those behaviors are due to the trauma that they have been subjected to over their lifetime." Bard repeats her arguments that G.B. was not a victim in this case and that any framing by the Commonwealth that painted her as one was improper.

Bard argues that the prosecutor's "flagrant misconduct" violated Bard's right to a fair trial in violation of the 5th, 6th, and 14th Amendments of the United States Constitution and Sections 2, 7, and 11 of the Kentucky Constitution.

27

Standard of Review

Bard did not preserve this issue; however, she requests palpable error review under RCr 10.26, recited above. "[P]rosecutorial misconduct can assume many forms, including improper questioning and improper closing argument." *Duncan v. Commonwealth*, 322 S.W.3d 81, 87 (Ky. 2010) (citing *Brown v. Commonwealth*, 313 S.W.3d 577 (Ky. 2010)). Where no objection to the alleged misconduct was made, "we will reverse only where the misconduct was flagrant and was such as to render the trial fundamentally unfair." *Id.* (citing *Barnes v. Commonwealth*, 91 S.W.3d 564 (Ky. 2002)).

> The Court weighs four factors to determine whether improper conduct is sufficiently flagrant to require reversal, namely (1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused. We look at the claimed error in context to determine whether, as a whole, the trial was rendered fundamentally unfair.

*Brafman v. Commonwealth*, 612 S.W.3d 850, 861 (Ky. 2020).

Application

To begin, the Commonwealth's fleeting reference to Bard's choice not to speak with detectives during its closing argument, or its questioning of Detective Steenburgen and Detective Slack, did not amount to flagrant misconduct. "In general, '[t]he Commonwealth is prohibited from introducing evidence or commenting in any manner on a defendant's silence once that defendant has been informed of his rights and taken into custody.'" *Manning v.*

28

*Commonwealth*, 701 S.W.3d 478, 508 (Ky. 2024) (quoting *Hunt v.*

*Commonwealth*, 304 S.W.3d 15, 35 (Ky. 2009)).

> Not every isolated instance referring to post-arrest silence will be reversible error. It is only reversible error where post-arrest silence is deliberately used to impeach an explanation subsequently offered at trial or where there is a similar reason to believe the defendant has been prejudiced by reference to the exercise of his silence as a prosecutorial tool. The usual situation where reversal occurs is where the prosecutor has repeated and emphasized post-arrest silence as a prosecutorial tool.

*Id.* (citing *Wallen v. Commonwealth*, 657 S.W.2d 232, 233 (Ky. 1983)).

Here, a reminder of the specific exchange between the Commonwealth and Detective Steenburgen is illustrative. Detective Steenburgen testified that Bard was brought to the police station for questioning. The Commonwealth asked whether Bard was "read her *Miranda* rights," to which Detective Steenburgen answered in the affirmative. The Commonwealth asked if Bard talked to him, and he replied that she did not. The Commonwealth then asked, "when the interview — or attempted interview — was concluded, what did you do?" Detective Steenburgen described that he searched Bard's purse incident to arrest and located a "teal vibrating sex toy" and a phone in a glitter case.

In *Manning*, we held that similar fleeting references to the defendant's silence in the overall course of a law enforcement investigation were not "error, palpable or otherwise":

> Accordingly, both statements were made by the detective while providing the details of his investigation and neither were in response to a direct question by the Commonwealth. Moreover, these were fleeting comments within a multiple day trial and the Commonwealth did not improperly draw attention to Manning's choice to remain silent.

29

*Manning*, 701 S.W.3d at 508. While the Commonwealth did specifically ask Detective Steenburgen whether Bard spoke with detectives, we don't hold this distinction dispositive. The overall tone and context of the question in the entire dialogue suggests that the Commonwealth was simply moving the flow of the colloquy forward to discuss what happened after she was taken into custody — namely, what the search of Bard's purse revealed. Nevertheless, the comments were fleeting and did not emphasize Bard's guilt or attempt to frame it as evidence of Bard's guilt.

The same can be said about the Commonwealth's questioning of Detective Slack, whose testimony regarding Bard's refusal to talk with detectives was *not* directly solicited by the Commonwealth. There, Detective Slack was testifying as to the circumstances leading up to the resisting arrest charge. The jury had watched video footage from an officer's body-worn camera showing Bard being non-compliant — screaming at officers, telling them to leave, attempting to run from officers, and positioning her body in an attempt to make the arrest difficult — when officers were arresting her, and Detective Slack was testifying as to his observations of Bard's demeanor at the time leading up to her arrest. The Commonwealth's closing argument, which repeated Detective Slack's testimony, was also aimed at Bard's pre-arrest hostile demeanor and Bard's actions giving rise to the resisting arrest charge.

As discussed in the preceding section, the Commonwealth's introduction of evidence indicating that G.B. suffered from psychological maltreatment from witnessing the abuse of her sisters was not improper KRE 404(b) evidence, as it

30

was offered not to show conformity with a character trait but as evidence that the accused acts occurred. Framing G.B. as a victim is simply another way of stating that she experienced maltreatment, particularly since the Commonwealth made clear that there were no allegations that G.B. suffered physical abuse nor did any criminal charge pertain to G.B. A recitation of the Commonwealth's closing argument is again useful in providing accurate context:

> They say, oh let's feed the children something. [G.B.] never got abused. I'm not even going to argue [G.B.] got abused, even though I might want to. I'm not going to because none of the girls have ever said [G.B.] got abused. If they wanted to make this up, why didn't they? Why wouldn't they say, "Oh, yeah, mom did it to [G.B.] too. She was out there with us." None of them — "[G.B.] was never abused." And that's been the story from the beginning, it's the story throughout. [G.B.] has never said she was abused. But she will tell you about what happened to [B.D.] and [K.B.], as you heard.

Approximately ten minutes later, the Commonwealth remarked, "[G.B.] told us, the defendant never hurt her, but she witnessed her hurt [B.D.] and [K.B.]". And finally, the Commonwealth stated, "For [G.B.], [Dr. Currie] only diagnosed her with psychological maltreatment. And [Dr. Currie] told us that was because [G.B.] had to observe her sisters being abused." As discussed in the prior section, this testimony says nothing beyond what we have declared in the last section to be appropriate: G.B. witnessed her sisters be abused, and from that, she was diagnosed with psychological maltreatment. Similarly, Bard fails to demonstrate how the Commonwealth's questioning of SSC Young amounts to prosecutorial misconduct above and beyond what she alleges regarding SSC Young's victim impact testimony, addressed in the following section.

31

"[U]npreserved claims of error cannot be resuscitated by labeling them cumulatively as 'prosecutorial misconduct.'" *Noakes v. Commonwealth*, 354 S.W.3d 116, 122 (Ky. 2011) (quoting *Young v. Commonwealth*, 50 S.W.3d 148, 172 (Ky. 2001)).

Ultimately, Bard has not demonstrated flagrant misconduct on behalf of the Commonwealth. Her claim of prosecutorial misconduct fails.

### D. The social worker's victim impact testimony about G.B. was not improper.

During sentencing, SSC Young testified on the impact the convictions had on K.B., B.D., and G.B. In regard to G.B., SSC Young testified that since DCBS removed the children from Bard, G.B. has displayed behavioral challenges. G.B. has treated her sisters, especially K.B., poorly. G.B. has degraded and belittled K.B. and has called K.B. "fat" and "ugly." G.B. also "struggled with bedwetting" and "using the restroom . . . in her pants." She would then "play in it and smear it on the walls." G.B. "struggled with nightmares" and had "to repeat kindergarten just because she was so behind educationally." G.B. "attended therapy as well." The Commonwealth asked SSC Young "do you feel like a lot of these behaviors from [K.B.], [G.B.], and [B.D.] are because of the trauma they went through?" SCC Young responded, "there's not a doubt in my mind that those behaviors are due to the trauma that they have been subjected to over their lifetime."

During the penalty phase closing, the Commonwealth asked the jury to sentence Bard in part based on G.B.'s suffering:

32

> Ladies and gentlemen, you heard the evidence, as well as I did. You know what [K.B.], [G.B.], and [B.D.] went through. You sat here, and here's the thing — you only heard about it. You only experienced a fraction of what those young ladies went through. . . . And again, I'd ask you to just think about what you've heard and what those girls experienced. Think about how long they're going to have to live with that. And I ask you to think about that, and I ask you to consider whether or not a minimum is appropriate in this situation. Based on what they have to live for, for life, I just don't think that it is. So I'd ask you to consider that. I'd ask you to take that into your deliberations. And I'd ask you to fix an appropriate punishment in this case. But I would say that a minimum is simply not enough.

Bard argues that G.B. was not a proper victim eligible to provide a victim impact statement.

Standard of Review

Bard did not preserve this issue; however, she requests palpable error review under RCr 10.26, recited above.

Application

Bard argues that the Commonwealth admitted multiple times that G.B. "never got abused" and that the Commonwealth never charged Bard with any crimes against G.B. However, this does not mean that G.B. was not still *a* victim of Bard's actions. Bard provides scant authority for her position. Kentucky case law, following United States Supreme Court case law, "permits the prosecution to introduce evidence regarding the impact of the crime on the family of the victim and to argue that impact during closing argument in the penalty phase." *Epperson v. Commonwealth,* 197 S.W.3d 46, 58 (Ky. 2006). Once again, Bard falls far short of demonstrating palpable error.

**E. There was no cumulative error.**

33

Bard contends that her convictions should be reversed on the basis of cumulative error. The cumulative error doctrine states that where there are "multiple errors, although harmless individually, [the errors] may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown*, 313 S.W.3d at 631. Bard claims that if the asserted errors do not individually warrant reversal, then the cumulative effect of the errors requires reversal. We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial. *Funk v. Commonwealth*, 842 S.W.2d 476 (Ky. 1992).

Because cumulative error only applies when there is an accumulation of errors, it is inapplicable where, as here, we found no error. Bard is not entitled to a reversal under the cumulative error doctrine.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

All sitting. Lambert, C.J.; Bisig, Conley, Goodwine, Keller, and Nickell, JJ., concur. Thompson, J., concurs in result only.

COUNSEL FOR APPELLANT:

Robert C. Yang
Kathleen Kallaher Schmidt
Assistant Public Advocates

COUNSEL FOR APPELLEE:

Russell M. Coleman
Kentucky Attorney General

Joseph A. Beckett
Assistant Attorney General